## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: _____1:22-cv-00335_____

WHITNEY PORTER, M.A.,

      Plaintiff,

v.

THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate; and

VENKATESHWAR "VENKAT" REDDY (in his official and individual capacities),

      Defendants.

-------------------------------------------------------------------------------------------------------------------

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

-------------------------------------------------------------------------------------------------------------------

Plaintiff, Whitney Porter, by and through her counsel, hereby files this Complaint against Defendants, THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate ("Defendant Board"); and VENKATESHWAR "VENKAT" REDDY (in his official and individual capacities) ("Defendant Reddy" and collectively, "Defendants"), and in support thereof, states and alleges as follows:

### NATURE OF THE CASE AND THE PARTIES

1.     This is a civil action for damages and other relief against Defendant Board under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq* (1964) ("Title VII") and against Defendants under the Civil Rights Acts of 1871, 42 U.S.C. § 1983 ("1983") for discrimination on the grounds of gender, retaliation and other deleterious terms and conditions of employment.

2.     Plaintiff Whitney Porter, M.A. ("Plaintiff") is a resident of the State of Colorado.

1

3.      At all times relevant to this Action, Plaintiff was employed by Defendant Board at the University of Colorado.

4.      The University of Colorado ("CU") is a system of public universities in the State of Colorado consisting of four campuses: University of Colorado Boulder ("CU Boulder"), University of Colorado, Colorado Springs ("UCCS"), University of Colorado Denver ("CU Denver"), and the Anschutz Medical Campus ("Anschutz Medical Campus").

5.      CU is engaged in the business of higher education and is established and regulated by Article IX, §§ 12 and 13, Colorado Constitution and State statutory law, and C.R.S. §§ 23-20-101, *et seq.*  As a public institution, CU is subject to the requirements of the Colorado Constitution, the United States Constitution, and applicable federal law.

6.      CU, including UCCS, is operated and governed autonomously by Defendant Board.

7.      As provided by the state constitution and state law, Defendant Board, duly elected, constitute a body corporate.

8.      Defendant Board exercises general supervision of CU and its four campuses, including UCCS, and, subject to narrow exceptions, it has the exclusive control and direction of all funds of and appropriations to CU.

9.      Defendant Board, as CU's governing body, meets the definition of an "employer" under the applicable statutes, including Title VII.

10.      At all times relevant to this Action, Defendant Reddy was either Dean of the UCCS College of Business or Chancellor of UCCS.

11.      Defendant Reddy is a male.

12.     During certain times relevant to this Action, Defendant Reddy acted as Plaintiff's superior and supervisor and maintained decision-making authority as to Plaintiff's employment at CU.

13.     At all times relevant to this Action, Defendant Reddy has acted under color of law in performance of his duties as Dean of the UCCS College of Business and subsequently Chancellor of UCCS and is sued in both his official capacity for equitable relief and his individual capacity for money damages.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the employment practices alleged to be unlawful were committed in the District of Colorado.

16.     Plaintiff has exhausted all administrative prerequisites to the filing of this action.

17.     This lawsuit was commenced within ninety (90) days of Plaintiff's receipt of a Notice of Right to Sue, dated November 8, 2021, from the United States Department of Justice, Civil Rights Division with respect to Charge of Discrimination No.: 541202101034 filed with the United States Equal Employment Opportunity Commission ("EEOC").

## FACTUAL ALLEGATIONS

*Plaintiff's appointment at CU*

18.     Plaintiff, a woman, completed her undergraduate studies at UCCS in 2004, and subsequently obtained a Master of Arts degree in counseling from Adams State University in 2007.

19.     Plaintiff has worked for Defendant Board since her matriculation from that program in 2007.

20.     In 2007, Plaintiff was initially employed as an academic advisor at the UCCS College of Business.

21.     In 2011, Plaintiff was promoted to senior academic advisor at the UCCS College of Business.

22.     In December of 2014, Plaintiff was appointed to the position of Assistant Director of Graduate Programs in the College of Business for the Graduate School of Business Administration at UCCS.

23.     Plaintiff was forced out of her position at the UCCS College of Business in May of 2017 and took a temporary position at the UCCS College of Education in June of 2017.

24.     In October of 2017, her position as Senior Academic Specialist at the UCCS College of Education became permanent, and she holds this position to date.

25.     As a condition of her employment at UCCS, Plaintiff agreed to perform her duties and responsibilities consistent with her rights and responsibilities as an employee and CU's policies and procedures, promulgated by Defendant Board.

26.     Among the policies and procedures is UCCS's Discrimination and Harassment Policy[1] (the "Nondiscrimination Policy") and the Office of Institutional Equity Resolution Procedures[2] (the "OIE Procedures", and collectively the "Nondiscrimination Policy and Procedures"), which set forth a multitude of promises from UCCS to Plaintiff with respect to the prohibition against workplace discrimination, retaliation, harassment, and hostile work environment, and specifically the manner in which prohibited conduct must be handled within UCCS.

---

[1] The Nondiscrimination Policy may be found at https://vcaf.uccs.edu/sites/g/files/kjihxj1631/files/inline-files/2021_FEB_15-300-017%20Discrimination%20and%20Harassment%20Policy%20%28APPROVED%29.pdf
[2] The OIE Procedures may be found at https://equity.uccs.edu/

27.     As set forth in the Nondiscrimination Policy, the UCCS claims to foster a climate that encourages prevention and reporting of protected class discrimination and harassment and promises to provide prevention efforts and respond to all reports promptly, provide support and safety measures to address safety, and recognize the inherent dignity of all individuals involved.

28.     More specifically, by way of this Nondiscrimination Policy and Procedures, Defendant Board promised, without limitation, as follows:

   a.   that UCCS is committed to providing an environment where all individuals can achieve their academic and professional aspirations free from unlawful discrimination, harassment, and/or related misconduct based on protected class status;

   b.   that it is critical to this commitment that anyone who believes they may have been the target of protected class discrimination or harassment in the context of University educational programs, activities, or employment, to feel free to report their concerns for appropriate investigation and response, without fear of retaliation;

   c.   that the UCCS Office of Institutional Equity (OIE) is responsible for the administration of this policy, as delegated by the Chancellor;

   d.   that additional procedures are available on the OIE website, which include the "Office of Institutional Equity Resolution Procedures;

   e.   that UCCS prohibits unlawful discrimination and harassment based on protected class, and related misconduct. UCCS defines "protected classes" to include the following: race, color, national origin, <u>sex</u>, pregnancy, age, disability, creed, religion, sexual orientation, <u>gender identity</u>, <u>gender expression</u>, veteran status, political affiliation or political philosophy;

   f.   that this prohibition applies to all students, faculty, staff, contractors, patients, volunteers, affiliated entities, and other third parties;

   g.   that any violations may be subject to disciplinary action, up to and including, expulsion or termination of employment, as applicable;

   h.   that UCCS will consider what appropriate potential actions should be taken;

   i.   that this prohibition applies to conduct that occurs in the context of UCCS educational programs, activities, or employment;

   j.   that UCCS takes prompt and effective steps reasonably calculated to stop protected class discrimination and harassment and/or hostile environment, prevent its recurrence, and as appropriate, remedy its effects.

   k.   that the conduct listed below is prohibited, as are attempts to commit, and aiding,

abetting, or inciting others to commit them. Prohibited conduct also includes conduct engaged in by electronic means.

    i.   "Discrimination" occurs when an individual suffers an adverse consequence on the basis of a protected class. <u>Examples include, but are not limited to, failure to be hired or promoted</u> or denial of admission to an academic program based on protected class status.

   ii.   "Harassment" means unwelcome verbal or physical conduct related to one's protected class that unreasonably interferes with an individual's work or academic performance or creates an intimidating or hostile work or educational environment.

l.   that related misconduct may be further defined by OIE Procedures

m.   that any individual may report incidents of possible protected class discrimination or harassment to the OIE;

n.   that Responsible Employees must report any incident of possible Protected Class Discrimination and Harassment to the OIE. OIE Procedures defines the term "responsible employee" and the information that must be reported.

o.   that when an alleged violation of this policy involves more than one University of Colorado campus, the campus with primary disciplinary authority over the respondent shall investigate the complaint pursuant to its applicable complaint process and procedure. The campus responsible for the investigation may request the involvement or cooperation of any other affected campus and should advise appropriate officials of the affected campus of the progress and results of the investigation;

p.   that reports or complaints pursuant to this policy will be addressed in accordance with the OIE's Procedures, which includes definitions applicable to this policy and related misconduct.

29.    The UCCS Nondiscrimination Policy and Procedures provide that discrimination occurs when an individual suffers an adverse consequence on the basis of a protected class, which includes gender.

30.    The Nondiscrimination Policy and Procedures were and remain consistent with Defendant Board's "Regent Law, Article 10", by which Defendant Board ensures that neither CU nor its officials will discriminate on the basis of race, color, national origin, pregnancy, sex, age disability, creed, religion, sexual orientation, gender identity, gender expression, veteran status,

political affiliation or political philosophy in admission and access to, and treatment and employment in, its educational programs and activities.

***Defendants efforts to force Plaintiff out of her employment through repeated acts of discrimination and harassment, that of which was tantamount to a Hostile Work Environment***

31.     During the latter part of Plaintiff's employment at the UCCS College of Business, Defendants have threatened to terminate Plaintiff's employment based upon entirely unsubstantiated and pretextual grounds, which will be described more fully below.

32.     In her role, Plaintiff was subjected to the pattern of traumatizing and humiliating mistreatment engendered by the then-Dean, Defendant Reddy, who is now the Chancellor of UCCS.

33.     Under Defendant Reddy's leadership, Plaintiff was exposed to a sexist and toxic work environment at the UCCS College of Business, which Defendant Reddy imparted directly or through his surrogates.

***Defendant Reddy's Actions Demonstrate His Pretextual and Discriminatory Intentions to Impact Plaintiff's Continued Employment***

34.     Defendant Reddy's discriminatory animus toward Plaintiff was palpable and was made apparent through various communications between herself and other employees.

35.     At the direction of then-Dean Defendant Reddy, the Dean's office monitored Plaintiff's arrival and departure times on a daily basis.

36.     Plaintiff was the only employee monitored in this manner, despite the fact that she held a management position.

37.     In fact, a student employee, Brandon Heinz, who worked under Plaintiff's supervision, routinely received calls from the Dean's surrogates at the conclusion of Plaintiff's

workdays, inquiring as to her whereabouts, notwithstanding the fact that she was always in her office.

38.     Regularly, Defendant Reddy would send his subordinates to her office at around 8:00 a.m. and 5:00 p.m., respectfully, on pretexts of inquiring about extraneous items, which could easily have been asked via e-mail.   The singular purpose of this exercise was apparent—to intimidate or harass Plaintiff.

39.     Despite the fact that other managerial employees would arrive for work much later than Plaintiff, said employees were never comparably monitored.

***Several further instances in which Plaintiff was
harassed and threatened with termination***

40.     In addition, Plaintiff suffers from migraine headaches, but, unlike her colleagues, could not simply call out sick on the occasion when she suffered from same.

41.     Instead, she was forced to go to a doctor's office to verify the migraine and have it documented, notwithstanding that this would exacerbate the condition.

42.     Despite the fact that the CU policy requires a medical note for absences of more than three days, Plaintiff was required to submit a note for a one-day absence.

43.     Not only did Defendants unlawfully apply different standards for Plaintiff compared with her colleagues, Plaintiff was told that her failure to comply with this standard would result in discharge.

44.     Moreover, upon information and belief, Plaintiff was the only person asked to provide a medical note in order to take a sick day.

45.     On one particular occasion in which Plaintiff was violently ill and obtained a doctor's note in support of her need to "call out sick", Defendants inexplicably refused to allow

her to stay home, mandated that she come to the office, and advised that if she did not come to work, she would be terminated.

46.     Defendants claimed that Plaintiff had no remaining sick days, a statement that was simple false and conjured to justify their harassing behavior.

47.     Defendants further demanded that Plaintiff obtain a sick note, without any lawful justification to do so.

48.     Significantly, as an exempt employee, Plaintiff was entitled to be paid as long as she worked one day during a calendar week and Defendants failed to provide any justifiable reason as to why her sick leave "bank" could not have gone into temporary negative status.

49.     With no reasonable alternative, and so as to save her job, Plaintiff obliged, obtained a doctor's note, and presented to work.

50.     Defendants mandate that Plaintiff appear at CU while severely ill, and their threat to terminate her, were rooted in nothing more than Defendants' discriminatory animus, and were consistent with their long line of harassing behavior.

51.     At one point during Plaintiff's employment with UCCS, the air conditioning system in Plaintiff's office building broke in the middle of summer at a time when it was over 90 degrees inside the building.

52.     Every affected employee, except for Plaintiff, was permitted to leave the office and work from home.

53.     However, Plaintiff was told that she had to remain in the building because she lacked an adequate set up with which to telecommute for the remainder of the day, despite the fact that no one inquired as to the status of Plaintiff's personal computer or internet access.

54.     Contrary to Defendants' baseless assertion, Plaintiff was completely capable of working from home and the purpose of this treatment was poignantly clear—to harass and subject Plaintiff to a hostile work environment.

***Defendant Reddy's Discriminatory Animus
is Further Enforced by His Subordinates.***

55.     As Dean of the College of Business, Defendant Reddy's supervisory role lent itself to decision making with respect to the management of the employees within the College of Business at UCCS.

56.     In addition to the explicit authority that comes with a supervisory role, there is an implied authority that would engender Defendant Reddy's discriminatory intent to be carried out by his subordinates.

57.     On one occasion, in mid-February 2016, Plaintiff was forced to remain in her office and told that she could not leave it until she completed filed documents in accordance with an archaic, outdated paper system, despite the fact that UCCS moved to a digitalized system.

58.     This demand was made by Windy Adoretti, a subordinate of Defendant Reddy, who had previously been the graduate program director.

59.     Ms. Adoretti insisted that Plaintiff continue working on an outdated paper filing system, involving color-coded stickers on each file.

60.     Ms. Adoretti punitively forced Plaintiff to spend hours on this task for no reason whatsoever in order to undermine and abase Plaintiff, who was made to feel like a prisoner, which was the precise intent of the order.

61.     Additionally, although others were permitted to leave work early by shifting their hours earlier in the day, Plaintiff's ability to do so was at the whim of her supervisors.

62.     Regularly, Plaintiff would be assigned new work at 4:00 p.m. and told that if she were committed to the job, she should be willing to work extra hours.

63.     Plaintiff's supervisors made it abundantly clear that Plaintiff would be judged for leaving as scheduled and that her job could be in jeopardy because of this.

64.     These "11th Hour" assignments were not emergent, were designed to demoralize Plaintiff, and were punitive in nature.

65.     Further, the then-undergraduate director, Rashell McCann, would tell students that Plaintiff was "misadvising" them, an act done to undermine the students' trust in Plaintiff and cause rumors to that effect to disseminate.

66.     Upon information and belief, Plaintiff's computer was monitored, as it became apparent that members of UCCS administration had prior knowledge of information that had not theretofore been shared with them.  Plaintiff also discovered odd, inexplicable technical issues, including delays.

67.     At the time that Plaintiff's employment as assistant director began, the department consisted of six employees including Plaintiff, the director, the admissions coordinator, and three student employees.

68.     Thereafter, three others, including the director, quit their jobs because they could not endure the hostile work environment or were discharged.

69.     For an extended time period, the remaining student employee and Plaintiff were forced to do the work of five and the majority of the responsibility fell on Plaintiff's shoulders.

70.     Notably, when other UCCS employees were assigned additional responsibilities, their pay was increased accordingly.

71.     However, Plaintiff's pay was not, demonstrating yet another example of disparate treatment and a concerted effort to force Plaintiff out of her job.

72.     Thereafter, the incoming female director expressed to Plaintiff that there was a targeted goal of discharging Plaintiff.

73.     This female director expressed that she too was subject to a toxic work environment, because both her and Plaintiff were female.

74.     Like her predecessor, this female director left her job because she had been micro-managed and degraded by Defendant Reddy and his subordinates.

75.     Routine decision-making as to student issues within the purview of Plaintiff's job were questioned and dismissed on the ground that she lacked authority, experience or the wherewithal or autonomy to perform basic tasks.

76.     In egregiously harassing fashion, Plaintiff was also accused of being an alcoholic and drinking inappropriately and belligerently during a work event, apparently because she supportively and rightfully cheered on a close colleague as they were called upon to receive an award.  This was by no means reason to accuse Plaintiff of being drunk, and in fact, Plaintiff was not drunk.

77.     Significantly, it was Plaintiff's supervisors who were consuming alcoholic beverages.  Moreover, at least two other colleagues were cheering yet were not disciplined in the same fashion.

78.     Plaintiff's supervisors' baseless and defamatory accusation, and resulting discipline, was effectuated intentionally in order to degrade and humiliate Plaintiff, with the hope that Plaintiff would quit her job.

79.     Of note, that year, Plaintiff was voted best advisor on campus, yet her performance on the job was unimportant and conflicted with Defendants' intent to discredit and remove her.

80.     Prejudice is rarely an overt act, however, in this case, Defendants were blatantly discriminatory in their conduct toward Plaintiff.  Their actions demonstrate the inequitable, unjust, and discriminatory practice of dismissing and undervaluing Plaintiff's contributions as a woman.

***Plaintiff's Complaint to the Human Resources Department and subsequent retaliatory conduct***

81.     Plaintiff sought the counsel of the human resources department on numerous occassions, which not only failed to address her complaints but, in fact, caused superiors to escalate their aggression toward her.

82.     In fact, when Plaintiff attempted to file grievances with the human resources department, no corrective action was taken.  Instead, Plaintiff was advised that she should leave her position at the UCCS College of Business and begin working for a different college within CU.

83.     In 2017, Plaintiff was pressured into resigning from her position at the UCCS College of Business.  It became obvious that the goal of Defendant Reddy, effectuated by both him and his subordinates, was to harass and remove employees from their jobs if they did not quit on their own.

84.     Given the toxic, hostile, and harassing work environment, precipitated by Defendant Reddy's discriminatory and retaliatory animus, Plaintiff was ultimately left with no choice but to resign from the College of Business, a position that she had held for a decade.

85.     Due to positive employee relations on campus, Plaintiff secured a position with the UCCS College of Education in a temporary capacity, which led to a permanent position in October of 2017.

86.     However, this new position was not a leadership track position, unlike her former position at the UCCS College of Business.

87.     Upon starting her new position in the UCCS College of Education, it became clear to Plaintiff that the UCCS College of Business was reading and sending emails from Plaintiff's UCCS email account, which was both a staff and student email account.

88.     When Plaintiff asked Ms. Adoretti of the UCCS College of Business to stop using her email account, she was told that the email was being used to communicate with College of Business students and that it was Plaintiff's responsibility to work with the Office of Information Technology (OIT) to get a new email account.

89.     However, upon reporting this to the Dean of the College of Education and OIT, Plaintiff learned that the College of Business should never have been able to use the Plaintiff's email account as it was a student email account at the time as well as a personal email account and that Plaintiff was able to keep her email account.

90.     The College of Business and Ms. Adoretti were ultimately removed, but within that time frame prior to removal, they had access to all of Plaintiff's business and personal email on that account.

*Retaliation*

91.     Because Plaintiff had objected to the way she was treated, UCCS began a campaign in order to get her to quit her job or to discharge her on pretextual grounds.

92.     Defendants made numerous obvious attempts to shift Plaintiff's expectations, duties, requirements, and responsibilities after she had lodged complaints with HR.

93.     For example, prior to 2016, Plaintiff had never received an unsatisfactory annual work evaluation and, in fact, had been praised for her work performance.  Indeed, no one other

than Defendant Reddy and his associates had ever taken issue with Plaintiff, neither personally nor professionally.

94.     Plaintiff was an effective assistant director and supervisor, as evidenced by, among other things, her annual performance reviews.

95.     Despite the hostility and abuse to which she was subjected, Plaintiff always did her best to maintain a positive attitude and complete any and all assigned responsibilities and to go beyond the effort that was required.

96.     For the first time, in an annual performance evaluation for the 2016 academic year, Plaintiff received a "below expectations" rating and was provided with a personal improvement plan to follow between February 7, 2017 and May 7, 2017.

97.     It was made clear to Plaintiff that, if she failed to meet these performance expectations, she would be terminated at the conclusion of this probationary period.

98.     When Plaintiff inquired how and why her performance did not meet expectations, she was informed that she did not "fit the business culture."

99.     Upon requesting specific examples, Plaintiff was provided with information in direct contradiction of that given in the immediately preceding academic year.  For example, she was reprimanded for having her door closed for three weeks during which she focused on the commencement of the semester and census week tasks because the university had an "open-door policy" that should be followed.  However, during the prior performance evaluation, she was advised to shut the door when performing these tasks to reduce interruptions.

100.     Furthermore, Plaintiff had numerous one-on-one meetings with her supervisor throughout the 2016 academic year in which no behavioral or substantive performance issues were

ever brought to her attention.  In fact, in 2016, Plaintiff was nominated for the "Advisor of the Year" award.

101.    Despite Plaintiff's compliance with the performance improvement program, the hostile work environment continued.  Examples included, as stated above, being locked in her office and required to work manually for tasks that could undoubtedly have been performed on a computer more easily and efficiently, being directed to obtain medical notes for sick days, and being explicitly told that she was prohibited from volunteering for various tasks.

***Retaliation in Denial of a Better Position at UCCS***

102.    The pattern of ongoing discrimination, harassment, and hostility continued beyond Plaintiff's forced resignation from the UCCS College of Business.

103.    In 2019, Plaintiff applied for, was offered, and accepted a job as Graduation and Academic Services Coordinator in the Office of the Registrar, with a proposed salary of $52,000.

104.    As of December 2019, Plaintiff was merely awaiting final correspondence and she was scheduled to begin work in January 2020.

105.    However, all positions with salaries of $50,000 and more required the Chancellor's signature as his micromanagement extended down to that level.

106.    Consistent with his discriminatory and retaliatory animus, Defendant Reddy, who had taken over as UCCS Chancellor at the time, refused to sign off on the letter, which would finalize Plaintiff's position.

107.    Defendant Reddy's refusal to sign her final offer letter was in retaliation for her earlier HR complaints made during Defendant Reddy's tenure as Dean of the School of Business, which resulted in consequence of his own harassment of Plaintiff and the hostile work environment engendered under his supervision.

108.    Plaintiff did not receive an explanatory letter, but was ultimately informed that she was not given the position because her salary would have increased from $49,500 to $52,000.

109.    Notably, many administrators at UCCS earn far in excess of this amount, making that explanation entirely disingenuous.

110.    During the summer of 2020, the same job position was reposted and Plaintiff applied for the second time.

111.    Plaintiff was interviewed, but then informed that she lacked the requisite experience to move forward as a candidate.

112.    Plaintiff sent emails to the ethics and compliance officers to inquire how she could not be qualified for a position that had been offered to her the preceding year, yet received no reply to the inquiry.

113.    Plaintiff also called the human resources department, only to be informed that other candidates were more experienced.

114.    As a result, purely based on retaliatory grounds, Plaintiff was denied an opportunity for which she was most certainly qualified.  To the extent that any positions involving upward mobility at the UCCS would involve a salary in excess of $50,000, Defendant Reddy had personally blocked her professional development.

115.    In fact, Plaintiff is aware that comparably-situated colleagues who do not hold Master's degrees earn more than $70,000 per year.

116.    In a leadership position, Plaintiff would be earning much more than her current salary.

117.    As such, Defendant Reddy's retaliatory acts deprived her of the opportunity to advance and are the basis for her career stagnation.

118.    The most recent correspondence that Plaintiff has received from human resources indicated that she was not selected for further consideration was dated November 10, 2020.

119.    In effect, Defendant Reddy has personally blocked Plaintiff's professional development.  Comparably situated colleagues who do not hold Master's degrees earn more than $70,000 per year.  Defendant Reddy's retaliatory acts have deprived Plaintiff of the opportunity to advance and is the basis for her career stagnation.

***Plaintiff Filed a Charge of Discrimination***
***With the EEOC***

120.    On February 9, 2021, Plaintiff filed Charge of Discrimination No.: 541202101034 with the EEOC, in which she alleged that Defendants had discriminated against her based on her gender and had retaliated against her in violation of Title VII.

121.    On November 8, 2021, the United States Department of Justice issued Plaintiff a Notice of Right to Sue with respect to the Charge of Discrimination.

***Defendant Reddy's Unethical And Discriminatory Behavior***
***Toward Others Is Consistent With His Behavior Toward Plaintiff***

122.    Unfortunately, Defendant Reddy's discriminatory and retaliatory animus is not isolated, as he has humiliated, bullied, harassed, and intimated other former female CU employees, similar to the conduct undertaken towards Plaintiff.

123.    Defendant Reddy's calculated pattern of behavior has had far-reaching detrimental influence on many individuals and has deprived others' from their career advancement.

124.    Defendant Reddy's conduct exemplifies one who cannot tolerate the career advancement of a creative women, and his disparate treatment towards women is apparent.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
(Discrimination and Hostile Work Environment in Violation of Title VII of the Civil Rights Act)

125.    Plaintiff incorporates the allegations in paragraphs 1 through 124 as if fully set forth herein.

126.    Plaintiff, as a woman, is a member of the class of persons protected from discrimination on the basis of gender under Title VII.

127.    Defendant Board, by and through its agents, and Defendant Reddy, as an individual, intentionally engaged in unlawful employment practices against Plaintiff because she is a woman.

128.    Defendant Board, by and through its agents, and Defendant Reddy, as an individual, discriminated against Plaintiff in connection with the terms, conditions and privileges of employment in violation of 42 U.S.C. § 2000e(2)(a).  The effect of these practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status because of her gender.

129.    Defendants' unlawful employment practices had a disparate and adverse impact on Plaintiff because of her gender.

130.    Plaintiff was subjected to a hostile work environment based upon membership in protected classes and suffered disparate treatment as a consequence thereof.

131.    Defendants retaliated against Plaintiff because of her membership in protected classes, resulting in her separation from employment on pretextual grounds.

132.    Defendants are responsible and liable for the acts and omissions of its agents and employees.  Defendant Board, by and through its agents, and Defendant Reddy, as an individual, have discriminated and retaliated against Plaintiff on the basis of gender.

133.     As a consequence of Defendants' conduct, Plaintiff has suffered damages and losses.

134.     Defendants' conduct was engaged in with malice or with reckless indifference to Plaintiff's federally protected rights within the meaning of Title VII.

### SECOND CLAIM FOR RELIEF
(Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as amended)

135.     Plaintiff incorporates the allegations in paragraphs 1 through 134 as if fully set forth herein.

136.     Plaintiff opposed practices targeted at herself that were unlawful under Title VII, including discrimination based on gender.

137.     As a result of Plaintiff's protected opposition to discrimination and the hostile work environment engendered and perpetuated by Defendants, Defendants retaliated against her by subjecting her to different terms and conditions of employment as described in this Complaint, including, but not limited to, treating Plaintiff in a condescending matter, questioning her achievements, crediting accusations made against Plaintiff that lacked basis, accusing Plaintiff of unprofessional conduct, failing to thoroughly and properly investigate or otherwise address Plaintiff's complaints about discrimination, making disparaging comments about Plaintiff to others, and ultimately forcing Plaintiff to resign from her position, that of which was tantamount to constructive termination.

138.     Defendants' conduct violated 42 U.S.C. § 2000e-3(a) of Title VII.

139.     As a direct and proximate result of Defendants' actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation, and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of the enjoyment of life, and other non-pecuniary losses.

140.    Defendants unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed, as legally permissible.

### THIRD CLAIM FOR RELIEF
(Fourteenth Amendment Due Process Deprivations Under 42 U.S.C. § 1983)

141.    Plaintiff incorporates the allegations in paragraphs 1 through 140 as if fully set forth herein.

142.    Based on the foregoing acts and omissions, Defendants, acting under color of state law, have violated the Due Process Clause of the Fourteenth Amendment as made actionable through 42 U.S.C. §1983.

143.    As a result of Defendants' actions, Plaintiff has sustained substantial economic losses, including, but not limited to, salary, bonuses, pensions and other monetary benefits as well as emotional harm and psychological trauma.

144.    Plaintiff has thereby been damaged in an amount yet to be determined.

145.    Defendants unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed, as legally permissible.

### FOURTH CLAIM FOR RELIEF
(Fourteenth Amendment Equal Protection Deprivations Under 42 U.S.C. § 1983)
Against Defendants

146.    Plaintiff incorporates the allegations in paragraphs 1 through 145 as if fully set forth herein.

147.    Based on the foregoing acts and omissions, Defendants, acting under color of state law, have violated the Equal Protection Clause of the Fourteenth Amendment as made actionable through 42 U.S.C. §1983.

148.    As a result of Defendants' actions, Plaintiff has sustained substantial economic losses, including, but not limited to, salary, bonuses, pensions and other monetary benefits as well as emotional harm and psychological trauma.

149.    Plaintiff has thereby been damaged in an amount yet to be determined.

150.    Defendants unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed, as legally permissible.

**FIFTH CLAIM FOR RELIEF**
(First Amendment Retaliation Under 42 U.S.C. § 1983)
Against Defendants Board and Krohnfeldt

151.    Plaintiff incorporates the allegations in paragraphs 1 through 150 as if fully set forth herein.

152.    Defendants violated Plaintiff's rights protected by the First Amendment by retaliating against her for engaging in protected speech.

153.    By acting under color of state law to deprive Plaintiff of her constitutional rights, Defendants violated 42 U.S.C. § 1983.

154.    As a result of Defendants actions, Plaintiff has suffered the loss of wages, benefits, and other monetary benefits as well as emotional harm and psychological trauma.

155.    Defendants unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed, as legally permissible.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff, Whitney Porter, respectfully requests that this Court enter judgment in her favor and against Defendants Board and Reddy, and order the following relief against them, respectively, to the extent provided by law:

A.      Compensatory damages including, but not limited to, those for emotional distress, inconvenience, mental anguish and loss of enjoyment of life;

B.      Back pay and benefits;

C.      Injunctive and declaratory relief;

D.      Front pay and benefits;

E.      Attorneys' fees and costs of this action, including expert witness fees, as appropriate;

F.      Pre-judgment and post-judgment interest at the highest lawful rate; and

G.      Such further relief as justice requires or the law allows.

**FURTHERMORE,** Plaintiff specifically prays that Defendants be enjoined for failing or refusing to:

(1)     Provide sufficient remedial relief to make Plaintiff whole for the losses she has suffered as a consequence of the discrimination and retaliation against her as alleged in this Complaint, including restoring Plaintiff to her position as Assistant Director of Graduate Programs at the College of Business and Administration and Graduate School of Business Administration at UCCS; and

(2)     Take such other appropriate non-discriminatory measures to overcome the effects of the discrimination and retaliation.

## PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

*(space intentionally left blank - dated and signature block on following page)*

23

Respectfully submitted: February 4, 2022.

By:     KATZ AND KERN, LLP


*s/ Chet Kern*
_____
Chet W. Kern, Esq.
44 Cook Street
Denver, Colorado 80206
Tel. (303) 398-7000
Email: ckern@katzandkernllp.com
*Attorneys for Plaintiff Whitney Porter, M.A.*

## CERTIFICATION OF GOOD STANDING

I hereby certify that I am a member in good standing of the Bar of this Court.

s/ Chet Kern
_____
Chet W. Kern, Esq.
44 Cook Street
Denver, Colorado 80206
Tel. (303) 398-7000
Email: ckern@katzandkernllp.com
*Attorneys for Plaintiff Whitney Porter, M.A.*

## CERTIFICATE OF SERVICE

I certify that on February 4, 2022, I filed the foregoing with the Clerk of the Court using

the CM/ECF System.

*s/ Chet Kern*

Chet W. Kern, Esq.
44 Cook Street
Denver, Colorado 80206
Tel. (303) 398-7000
Email: ckern@katzandkernllp.com
*Attorneys for Plaintiff Whitney Porter, M.A.*