**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:22-cv-00335-DDD-KLM

WHITNEY PORTER, M.A.,

     Plaintiff,

v.

THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate; and

VENKATESHWAR "VENKAT" REDDY (in his official and individual capacities),

     Defendants.

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS PURSUANT TO F.R.C.P. 12(b)(1) and 12(b)(6), AND REQUEST FOR A
HEARING**

---

     Plaintiff WHITNEY PORTER, M.A., by and through her attorneys, KATZ & KERN, LLP, hereby submits this Response in Opposition to the Motion to Dismiss by Defendants THE REGENTS OF THE UNIVERSITY OF COLORADO ("The Board") and VENKATESHWAR "VENKAT" REDDY ("Dr. Reddy"), and request for a Hearing. In support thereof, Plaintiff states as follows:

**AS TO CONFERRAL:** While Defendants' Motion to Dismiss lacks any statement regarding conferral, Plaintiff acknowledges that this motion falls within the conferral exemptions set forth in D.C.COLO.LCivR 7.1(b)(2). Notwithstanding same, to the extent that Plaintiff's complaint is deficient in any manner, which Plaintiff refutes, same may be corrected by amendment, and respectfully requests leave of Court to amend accordingly.

## INTRODUCTION

Plaintiff, a former employee within UCCS's College of Business, brings this action following years of ongoing hostility, harrassment, discrimination and retaliation in the workplace, engendered by her superior, former Dean of the College of Business and current Chancellor of UCCS, Dr. "Venkat" Reddy.  During said employment, Plaintiff was exposed to a sexist and toxic work environment, where she was micromanaged, held to drastically different standards than that of her male colleagues, forced to perform inexplicable tasks that could only be explained as designed to force her to quit, and was repeatedly threatened with termination without substantiation.  Despite reporting to CU's human resources department, her working environment only became more hostile, to the point that she was ultimately left with no choice but to resign and seek employment elsewhere, so as to "break free" from Dr. Reddy's control.  Unfortunately, Dr. Reddy continued in his discriminatory and retaliatory warpath against her as the interim Chancellor and Chancellor, refusing to authorize her appointment to a new position at UCCS and rejecting promotional opportunities that would have increased her salary.  To make matters worse, Plaintiff has become aware that Dr. Reddy has humiliated, bullied, harassed, and intimated other former female CU employees, similar to the conduct undertaken towards her, and this calculated pattern of behavior has had far-reaching detrimental influence on many individuals and has deprived others' from their career advancement.  As a result of Dr. Reddy's conduct, Plaintiff has not only been traumatized, but has been stifled from professional development, losing the opportunity to advance and left in a stagnant career.

Defendants attempt to overlook the egregious nature of their conduct by claiming certain legal insufficiencies with respect to the Complaint.  As set forth below, none of Defendants legal

arguments can be sustained as Plaintiff has sufficiently satisfied the liberal Federal pleading requirements for her claims.

## ARGUMENT SUMMARY

In her Complaint, Plaintiff describes the numerous instances of harrassment and intimidation engendered by Dr. Reddy. The events as Plaintiff describes them, taken as true as they must on this motion, plausibly allege discrimination and a hostile work environment in violation of 42 U.S.C. § 2000e(2)(a) ("Title VII") and the Fourteenth Amendment. Contrary to Defendants' arguments, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Following clearance from the EEOC to proceed with litigation, Plaintiff timely filed this lawsuit. Therein, Plaintiff has adequately pled discrimination and a hostile work environment, which continue to date. Moreover, contrary to The Board's contention, it is not an "arm of the state" but in fact, a "political subdivision" subject to suit under 42 U.S.C. §1983 under *Monell v. Department of Social Services* and its progeny. Given the clearly established constitutional rights that were violated by their actions, Dr. Reddy is not entitled to qualified immunity. As explained in full below, Defendants' motion should be denied in its entirety.

## LEGAL STANDARD OF REVIEW

A motion to dismiss for lack of subject-matter jurisdiction may be mounted either as a facial or factual attack. See, F.R.C.P. 12(b)(1). A facial attack assumes the allegations in the complaint are true and argues they fail to establish jurisdiction. See, *Pueblo of Jemez v. United States,* 790 F.3d 1143, 1148 n.4 (10th Cir. 2015) (citing *Holt v. United States,* 46 F.3d 1000, 1002 (10th Cir. 1995)). A factual attack goes beyond the allegations in the complaint and adduces evidence to contest jurisdiction. Id. Where a defendant brings a factual attack, as Defendants have

done here, a district court has "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." See, *Stuart v. Colo. Interstate Gas Co.,* 271 F.3d 1221, 1225 (10th Cir. 2001) (quoting *Holt,* 46 F.3d at 1003. The court's exercise of such discretion does not convert a Rule 12(b)(1) motion into a summary judgment motion unless "resolution of the jurisdictional question is intertwined with the merits." See, *Holt,* 46 F.3d at 1003.

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A complaint does not require detailed factual allegations; it simply must plead "enough facts to state a claim to relief that is plausible on its face." See, *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). When ruling on a defendant's motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), "a judge must accept as true all of the factual allegations contained in the complaint." See, *Erickson v. Pardus,* 551 U.S. 89, 93 (2007). In fact, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." See, *Bell Atlantic Corp.*, 550 U.S. at 556. The Tenth Circuit has held that in reviewing such a motion, the Court must accept the facts alleged in the complaint not only as true but viewed in the light most favorable to the plaintiff. See, e.g., *Mayfield v. Bethards,* 826 F.3d 1252 (10th Cir. 2016) (citing *Brown v. Montoya,* 662 F.3d 1152 (10th Cir. 2011)). Facts alleged upon information and belief, as with any factual allegations, must be accepted as true on a Rule 12(b)(6) motion. See, *Arista Records LLC v. Doe*, 604 F.3d 110, 119-20 (2d Cir. 2010).

## **ARGUMENT**

## **AS TO DEFENDANTS' POINTS I & II: EACH DISPUTED**

**I.    Plaintiff has adequately exhausted all administrative
      remedies and her claims are timely**

4

Defendants mistakenly contend that Plaintiff's Title VII claims based on acts occurring prior to April 15, 2020 (300 days before her EEOC Charge) are barred for failure to timely exhaust administrative remedies.  <u>See</u>, Defendants' MTD at 3.  Defendants also incorrectly argue that Plaintiff's § 1983 claims are barred by the two-year statute of limitations.  <u>Id</u>. at 5.  These arguments ignore the continuous pattern of discrimination against Plaintiff, which includes actions and inactions <u>within</u> the statutory period.

The "continuing violation doctrine" applies whenever a plaintiff's claim seeks redress for injuries resulting from a "series of separate acts that collectively constitute one unlawful act".  <u>See</u>, *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 672 (10th Cir. 2016) (quoting *Shomo v. City of N.Y.*, 579 F.3d 176, 181 (2d Cir. 2009)). A violation continues when the conduct as a whole can be considered a single course of conduct.  <u>Id</u>.  If one of the separate wrongful acts contributing to the collective conduct "occurs within the filing period," a court may consider the entire time period – including those separate acts falling outside the filing period – for purposes of determining liability.  <u>See</u>, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (emphasis added). In fact, the United States Supreme Court has recognized that hostile environment claims are different in kind from discrete acts, that their very nature involves repeated conduct, and that the "unlawful employment practice" cannot be said to occur on any particular day, but rather over a series of days or perhaps years.  <u>Id</u>. (internal citations omitted).

A plaintiff may establish a continuing violation by showing either that (1) a series of related acts was taken against him, with one or more of those acts occurring within the limitations period, or (2) the defendant maintained a company-wide policy of discrimination both before and during the limitations period.  <u>See</u>, *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1183-84 (10th Cir. 2003). The continuing-violation doctrine applies to hostile work environment claims under both § 1983

and Title VII.  See, *Lindberg v. N.M. DOT*, No. CIV 05-284 MCA/DJS, 2006 U.S. Dist. LEXIS 102223, at *26 (D.N.M. Aug. 1, 2006) (citing *Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1036 n.18 (7th Cir. 2003) ("The Supreme Court's ruling in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), although discussing the continuing violation doctrine in the Title VII context, applies equally to § 1983 cases.")).

Circuit courts have repeatedly applied the continuing violation doctrine in discrimination cases like this one.[1]  For example, in *Fitzgerald v. Henderson*, 251 F.3d 345 (2d Cir. 2001), the Court ruled that "under [the continuing violation] doctrine, if a plaintiff has experienced a 'continuous practice and policy of discrimination, . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" Id. at 359 (quoting *Gomes v. Avco Corp.*, 964 F.2d 1330, 1333 (2d Cir. 1992)). "'If a continuing violation is shown, a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred.'" Id. (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996)). A continuing violation may be found "**where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a**

---

[1] See, e.g. *Santucci v. Levine*, No. 17-CV-10204 (PMH), 2021 U.S. Dist. LEXIS 3956 (S.D.N.Y. Jan. 8, 2021), ("conduct outside the statute of limitations…may be relevant to explaining the relationship between the parties and how actionable conduct materialized"); *Levine v. McCabe*, 357 F. Supp. 2d 608, 616 (E.D.N.Y. 2005) ("A statute of limitations does not generally bar the introduction of evidence that predates the commencement of the limitations period but is relevant to events during that period."); *Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001); *United States v. Ashdown*, 509 F.2d 793, 798 (5th Cir. 1975) ("The statute of limitations is a defense…not a rule of evidence. . . . [It] has no bearing on the admissibility of evidence.").

discriminatory policy or practice." Id. (emphasis added) (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998); *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994)).[2]

In *Levine v. McCabe*, 357 F. Supp. 2d 608 (E.D.N.Y. 2005), the Court articulated the same point, concluding that "**in the employment discrimination realm, where untimely discrete acts of discrimination are alleged in conjunction with timely discrete acts of discrimination, the plaintiff may generally introduce the otherwise time-barred acts as evidence in support of his timely claims**." Id. at 616 (citations omitted) (emphasis added) (citing *Fitzgerald*, 251 F.3d at 365, and *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113). *Fitzgerald* and *Levine* both relied on the "continuing violation" doctrine to reject the defendants' statute of limitations defenses.

While Defendants are correct that Plaintiff asserts claims of hostility and discrimination *beginning* in 2016-2017, this behavior continued into November of 2020, when Dr. Reddy rejected her hiring in CU's Office of the Registrar for a second time do to his discriminatory and retaliatory animus. Approximately three (3) months later, well within the 300 day filing window, Plaintiff filed her Charge of Discrimination. See, ECF No.: 1 at ¶120. The gravamen of Plaintiff's Complaint is a continuing course of discrimination perpetrated by the same actor (Dr. Reddy), and as such, the series of events comprise the same unlawful conduct and give rise to timely claims in this case. See e.g., *Duncan v. Manager, Dep't of Public Safety*, 397 F.3d 1300, 1308-09 (10th Cir. 2005) (citations omitted).

## AS TO DEFENDANTS' POINT III: DISPUTED

I.   **Plaintiff Adequately Pleads A Claim For Hostile Work Environment and Gender Discrmination**

---

[2] In *Fitzgerald*, the defendants could not secure summary judgment on the plaintiff's hostile work environment claim, due in part to evidence of harassing conduct that preceded the statute of limitations. 251 F.3d at 365-66. Given that the motion at bar arises under Rule 12, Defendants face an even heavier burden than that of the *Fitzgerald* defendants.

In seeking dismissal of Plaintiff's hostile work environment and gender discrimination claims, Defendants do not contest that Plaintiff faced severe and pervasive intimidation and harrassment falling within the perview of Title VII. <u>See</u>, Defendant's MTD at 6-7. Rather, relying on *Gross v. Burggraf Const. Co.,* 53 F.3d 1531, 1537 (10th Cir. 1995), Defendants claim that Plaintiff has not pled that she was targeted specifically *because* of her gender, and therefore her claims must fail.

In the context of employment discrimination claims, the Tenth Circuit has ruled that a complaint raising a claim of discrimination does not need to conclusively establish a prima facie case of discrimination. <u>See</u>, Equal Employment Opportunity Commission v. JBS USA, LLC, 481 F. Supp.3d 1204 (10th Cir. 2020); *Bekkem v. Wilkie*, 915 F.3d 1258, 1274 (10th Cir. 2019); *Hunt v. Central Consol. School Dist.* (10th Cir. 2013); Fed.Rules Civ. Proc 12(b)(6), 28. U.S.C.A.; <u>see also</u>, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)(holding that "is an evidentiary standard, not a pleading requirement"); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72 (2d Cir. 2016), quoting *Littlejohn v. City of N.Y.,* 795 F.3d 297, 311 (2d Cir. 2015) (for the proposition Plaintiff has a minimal burden of alleging facts suggesting an inference of discriminatory motivation). The nature and specificity of the allegations required to state a plausible claim will vary based on context." <u>See</u>, *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (internal quotation marks omitted). A complaint is plausible on its face if it provides something "other than sheer speculation" to link the defendant's conduct with a discriminatory motive. Id. at 1194. Further, in making the plausibility determination, the court must also be mindful of the 'elusive' nature of intentional discrimination. *Vega*, 801 F.3d 72, 86 (2d Cir. 2015) quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. 248, 255 n. 8 (1981).

Here, Plaintiff has pled more than "sheer speculation" to link Defendants' conduct with a discriminatory motive. There is no dispute that as a female, Plaintiff is a member of a protected class. In her complaint, Plaintiff describes 1) her subjection to a pervasive work environment of repeated and ongoing abuse, 2) that Defendants maintained a targeted goal of forcing her out of her position because she is female, and 3) that Dr. Reddy exhibited similar behavior towards other female colleagues. See, e.g. ECF No.:1 at ¶¶72-74, 122. Plaintiff has cleared the relatively low bar of satisfying liberal pleading standards. Thus, the Complaint more than adequately pleads something "other than sheer speculation" to link Defendant's conduct with a discriminatory motive. *Khalik*, 671 F.3d at 1194.

Defendants reliance on *Gross,* 53 F.3d 1531 (10th Cir. 1995) is misplaced. In *Gross*, the Tenth Circuit reviewed an order granting summary judgment dismissing a gender discrimination (hostile work environment theory) claim, and expressly stated the "**After reviewing the admissible evidence in the record**, we conclude that [subordinate] has failed to demonstrate that there is a **genuine issue of material fact** in dispute that she was subjected to a hostile work environment because of her gender…We have examined the evidence as a whole to determine whether the totality of the circumstances supports a viable Title VII claim." **(emphasis added)**. Unlike in Gross, depositions have not been held in this case, nor have the parties exchanged any discovery, that of which Plaintiff anticipates will shed further light on the discriminatory nature of Defendants action.

Based on the foregoing, Defendants argument seeking dismissal is unsupported, and at the very least, premature.

## AS TO DEFENDANTS' POINT IV: DISPUTED

I.   **Plaintiff's Claim For Relief - Title VII Retaliation -
     States A Claim On Which Relief Can Be Granted.**

Defendants argue that Plaintiff has not pled a causal connection between her protected complaints CU's human resources department and subsequent adverse employment action, specifically because of the gap in time between the occurrences.  This conclusory contention is unsupported and does not warrant dismissal of Plaintiff's claim.

For a Title VII prima facie case of retaliation, the plaintiffs "must show (1) that [he] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Bekkem*, 915 F.3d at 1267 (quoting Khalik, 671 F.3d at 1193). An employee "may establish the causal connection by proffering evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."  <u>See</u>, *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239–40 (10th Cir.2004).  The Tenth Circuit has liberally construed "adverse employment action," examining the "unique factors relevant to the situation at hand."  <u>See</u>, *Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir.2004); <u>see</u> <u>also</u>, *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003).  The Tenth Circuit has expressly held that coworker hostility or retaliatory harassment may be an "adverse employment action" if it is sufficiently severe.  <u>See</u>, *Dick v. Phone Directories Co.*, 397 F.3d 1256 (10th Cir. 2005) citing *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir.1998).

At the outset, Defendants appear to have misstated Plaintiff's allegations – as per her complaint, Plaintiff objected to human resources department concerning the discriminatory and hostile conduct *on numerous occasions*.  <u>See</u>, ECF No.: 1 at ¶81.  The complaints were not addressed and instead, and as a result, each time Plaintiff's superiors escalated their aggression toward her.  Ultimately, Plaintiff's work environment became so unbearable that she was forced

to resign, tantamount to a constructive termination. Id., ¶¶82-83. There is sufficient pleading with respect to Plainitff's retaliation claim.

Moreover, as Defendants admit, the time gap between Plaintiff's complaints to human resources and Dr. Reddy's blocking of her subsequent employment at CU does not automatically preclude Plaintiff's retaliation claim. Rather, Plaintiff has sufficiently pled that 1) Dr. Reddy, and those acting under his direction, previously retaliated againt her, and 2) despite Plaintiff's inquiry, no explanation was given as to why Dr. Reddy would not authorize Plaintiff's new employment offer in CU Office of the Registrar nor why he refused to authorize other promotional opportunities that would have increased Plaintiff's salary. The totality of the circumstances more than suggests an inference of retaliatory motive. As such, it is apparent that her complaints put Defendants on adequate notice that she was complaining of conduct prohibited by Title VII.

## AS TO DEFENDANTS' POINT V: DISPUTED

I. **The Regents of the University of Colorado is a "political subdivision" of the State and a "person" subject to suit pursuant to 42 U.S.C. § 1983**

Defendants argue that Plaintiff's § 1983 claims (pertaining to Defendant Board), fail because Defendant Board is allegedly an "arm of the state".

The analyses of whether The Board enjoys Eleventh Amendment immunity and whether it is a "person" subject to suit under § 1983 are largely overlapping and addressed jointly herein. Defendants are wrong on both points. Neither federal nor Colorado law affords The Board Eleventh Amendment immunity from suit under ADEA or § 1983. Instead, under the applicable tests established by the Supreme Court, The Board is a "political subdivision" of the State and not an arm of the State. Therefore, The Board is not entitled to Eleventh Amendment immunity as to

any of Plaintiff's claims, and is particularly suable under § 1983 pursuant to *Monell* and its progeny.

### a. Fundamental tests for determining whether Defendant is an "arm of the state"

In *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989), the Supreme Court held that "a State is not a person within the meaning of § 1983," but reaffirmed the holding in *Monell*, "that a municipality was a person under § 1983." *Will*, 491 U.S. at 62. Addressing the possible tension, *Will* explained: "[O]ur holding here does not cast any doubt on *Monell*, and applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." Id. at 70 (citing *Mt. Healthy Bd. of Ed. v. Doyle*, 429 U.S. 274, 280 (1977)). Because Eleventh Amendment immunity does not shield the political subdivisions of a state, a governmental agency asserting sovereign immunity must establish that it is an arm of the State. *Lake Country Estates v. Tahoe Reg. Planning Agency*, 440 U.S. 391, 400–01 (1979) (citing *Edelman v. Jordan*, 415 U.S. 651 (1974); *Ford Motor Co. v. Dep't of Treas.*, 323 U.S. 459 (1945)).

The Court's analysis in *Mt. Healthy*, as developed in subsequent cases, is now used to determine whether a governmental entity is an arm of the state for Eleventh Amendment purposes. The answer to this question, according to *Mt. Healthy*, "**depends, at least in part, upon the nature of the entity created by state law**." 429 U.S. at 280. *Mt. Healthy* concluded the Defendant Department of Education did not enjoy Eleventh Amendment immunity.

First, the Court noted that "[u]nder Ohio law the 'State' does not include 'political subdivisions,' and 'political subdivisions' do include local school districts." Id. Second, the Court noted that the Board "is but one of many local school boards within the State of Ohio." Id. Third, the Court noted the Board "is subject to some guidance from the State Board of Education and receives a significant amount of money from the State." Id. (citations omitted). And finally, the

Court noted that "local school boards have extensive powers to issue bonds, and to levy taxes within certain restrictions of state law." Id.  On these facts, the Court concluded that the Defendant was "more like a county or city" and therefore was not protected by the Eleventh Amendment. Id.

The Supreme Court has considered additional factors in cases following *Mt. Healthy*. In *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391 (1979), the Court concluded that the Tahoe Regional Planning Agency was not an arm of the state based on six factors:

> (1) that the Tahoe agency was designated in the interstate compact as a 'separate legal entity' and a political subdivision; (2) that the majority of the Tahoe Agency governing members were appointed by counties and not by the states; (3) that the agency was exclusively funded by the counties; (4) that the compact expressly stated that the Tahoe Agency's obligations were not binding on the states; (5) that the regulation of land use was of local, rather than state-wide, concern; and (6) that the states did not have veto power over rules and regulations promulgated by the agency.

*Simon v. State Compensation Ins. Auth.*, 946 P.2d 1298, 1303 (Colo. 1997).

### b.  The Simon analysis

In *Simon*, the Colorado Supreme Court undertook an extensive analysis of *Mt. Healthy* and *Lake Country Estates*, as well as decisions of federal courts of appeals, and "determined that the appropriate analysis requires examination of (1) how state law characterizes the entity; (2) whether the entity is autonomous and free from the control of the State; and (3) whether a judgment against the entity would ultimately be paid by the State." *Graham v. State ex rel. Univ. of N. Colo.*, 956 P.2d 556, 562 (Colo. 1998) (citing *Simon*, 946 P.2d at 562). *Simon* ultimately concluded that the Colorado Compensation Insurance Authority (CCIA) was not an arm of the state and was subject to suit under § 1983.

*Simon*'s analysis of how state law characterized the CCIA is binding as it is analysis of state law by the state's highest court. *Simon* concluded that "the enabling statute in this case

suggests the CCIA should not be treated as an arm of the state." 946 P.2d at 1308. The court explained that "the express language of the statute establishes that the [CCIA] is not a state agency" and "characterizes the CCIA as a 'body corporate' and a 'political subdivision of the state,'" which the Court said, "are well established terms that denote entities such as counties and municipalities that are not arms of the state." Id.

As for the second factor, *Simon* concluded "that the legislature's expressed intent to grant the CCIA autonomy and to insulate the state from fiscal responsibility for the CCIA's conduct strongly supports the conclusion that, under the second factor, the CCIA should be treated as a 'person' for § 1983 purposes". Id. at 1309 (citations omitted).

Finally, for the third factor – whether a judgment against the entity would ultimately be paid by the State – *Simon* rejected the argument that "the state treasury criterion is the most important factor and should be held dispositive." 946 P.2d at 1306, and instead employed a balancing approach, ultimately opining that the CCIA could itself bear the financial liability of a judgment against it. Id. at 1310 (citations omitted).

In sum, *Simon* held that "[w]eighing the three applicable factors to determine whether the CCIA is a person or an arm of the state for § 1983 purposes, we conclude that the balance tips in favor of finding that the CCIA is not an arm of the state." Id. at 1311. The Court also noted that "[f]inding that the CCIA may be sued under § 1983 is consistent with our caselaw specifically protecting the ability of litigants to sue political subdivisions of the state when the law is unclear." Id. ("under the facts of this case, sound public policy requires that any doubt be resolved in favor of allowing the § 1983 suit to proceed").

      **c.  Applying the appropriate analysis, The Board is a not an arm of the state**

Although the Tenth Circuit has not expressly adopted the *Simon* analysis, it employs a similar analysis derived from *Mt. Healthy* and progeny. See *Graham*, 956 P.2d at 565 n.8 ("Tenth Circuit authority, while mirroring the three-factor analysis we adopted in *Simon*, recognizes [the state treasuries] factor as most important.").

> i. Colorado state law (constitution and statutes) characterize
>    The Board as a non-state agency

The Colorado Constitution establishes the University at Boulder, Colorado Springs, and Denver as "state institutions of higher education." Colo. Const. art. VIII, § 5(1). The state constitution also establishes the Board of Regents:

> There shall be nine regents of the university of Colorado who shall be elected in the manner prescribed by law for terms of six years each. Said regents shall constitute ***a body corporate*** to be known by the name and style of "The Regents of the University of Colorado". The board of regents shall select from among its members a chairman who shall conduct the meetings of the board and a vice-chairman who shall assume the duties of the chairman in case of his absence.

Colo. Const. art. IX, § 12 (emphasis added).

As noted in *Simon* (which held the CCIA, also a "body corporate," was not an arm of the state), the term "body corporate" is a "well established term that denote[s] entities such as counties and municipalities that are not arms of the state." 946 P.2d at 1308. Several Colorado statutes expressly define "state agency" to not include state institutions of higher education like the University of Colorado. See, e.g., C.R.S. § 24-30-1102(5); C.R.S. § 2-3-1701(5) ("'State agency' does not include . . . state-supported institutions of higher education"); C.R.S. § 24-30-1113(1) ("'state agency' does not include any state institution of higher education"); C.R.S. § 24-30-203.5(2)(d) ("'State agency' does not include a state institution of higher education."); and C.R.S. § 24-50-902(6) ("'State agency' shall not include an institution of higher education.")  There are

also state statutes that use "state agency" and "state institutions of higher education" as distinct terms. See, e.g., C.R.S. §§ 2-3-1304(1)(a), 24-30-1404(f).

> ii. The Board operates autonomously and is not subject to significant control of the State

Moreover, the Colorado Constitution provides:

> The establishment, management, and abolition of the state institutions shall be subject to the control of the state, under the provisions of the constitution and such laws and regulations as the general assembly may provide; except that the regents of the university at Boulder, Colorado Springs, and Denver may, whenever in their judgment the needs of that institution demand such action, establish, maintain, and conduct all or any part of the schools of medicine, dentistry, nursing, and pharmacy of the university…

Colo. Const. art. VIII, § 5(1) (emphasis added).

Subsection (2) of that same constitutional provision provides: "The governing boards of the state institutions of higher education, whether established by this constitution or by law, shall have the general supervision of their respective institutions and the exclusive control and direction of all funds of and appropriations to their respective institutions, unless otherwise provided by law." Id. § 5(2)

The enabling legislation tracks this grant of power to The Board. See C.R.S. § 23-20-111 ("The board of regents has general supervision of the university and control and direction of all funds of and appropriations to the university."); C.R.S. § 23- 20-112(1) ("The board of regents shall enact laws for the government of the university; appoint the requisite number of professors, tutors, and all other officers; and determine the salaries of such officers and the amount to be paid for tuition in accordance with the level of cash fund appropriations set by the general assembly for the university…").

In line with this view of The Board as an autonomous entity, it has adopted, as its primary policy, a commitment to preserving its self-governance.   University Policy 1.A, entitled

"Preservation of Self-Governing Responsibilities," provides: "The University of Colorado shall preserve the principle of self-governance.  As such, the University of Colorado shall oppose efforts to abolish or limit the constitutional authority of the Board to govern or enact policy for the university." Bd. of Regents, Univ. of Colo., "Policy 1: University of Colorado Self-Governance, Guiding Principles and Freedom of Expression."[3]

Further, Defendant's Regents Law 1(c)(1) states that the Colorado Constitution and laws enacted by Colorado's General Assembly operate to divest the Board of Regents of the constitutional grant of supervision and control of the university only when the legislation demonstrates a clear legislative intent to displace the Board of Regents' presumptive authority to govern the University of Colorado.[4]

Additionally, all CU employees "in professional positions" are exempted from the state's personnel system. See Univ. of Colorado, APS #5022, https://www.cu.edu/ope/aps/5022.2.  Thus, many CU employees are not subject to the state personnel system. In *Simon*, 946 P.2d at 1309, the court noted that the "CCIA's autonomy from the state is emphasized by the fact that its employees are exempted from the state personnel system."

The balance of relevant factors weighs heavily in favor of finding that Defendant is autonomous from the state, particularly in terms of managing the School of Medicine. See Colo. Const. art. VIII, § 5(1).

       iii.   A judgment against The Board would ultimately be paid by The Board and not the State

---

[3] https://www.cu.edu/regents/policy/1.
[4] https://www.cu.edu/regents/article-1

This final factor also weighs in favor of a finding that The Board is not an arm of the State. Notably, the Tenth Circuit treats this as the most important factor.  See, *Sonnenfeld v. Denver*, 100 F.3d 744, 749 (10th Cir. 1996); accord *Graham*, 956 P.2d at 565 n.8 ("Tenth Circuit authority . . . recognizes [the state treasuries] factor as most important.").

Colorado law establishes the "University of Colorado fund," which "shall be under the control and administration of the board of regents of the University of Colorado."  C.R.S. § 23-20-117.5(1). "The board of regents shall have authority and responsibility for all university funds," and "[t]he moneys in the fund shall remain under the control of the regents of the university of Colorado and *shall not be transferred or revert to the general fund of the state at the end of any fiscal year*." Id. (emphasis added). "[T]he University is not dependent entirely on the state for funds to respond to suits and . . . this fact weighs against a determination that it is an arm of the state." See, *Hartman*, 22 P.3d at 528 (citing *Wigger v. McKee*, 809 P.2d 999 (Colo. App. 1990)).

Further, The Board is authorized to issue bonds, see C.R.S. § 23-20-129, which lends further support to the conclusion that Defendant CU is not an arm of the state. See *Mt. Healthy*, 429 U.S. at 280; *Hartman*, 22 P.3d at 528.

Additionally, The Board is self-insured and is not a part of the state risk management fund which makes it unlikely that a judgment entered against the University will be paid by the state." *Hartman*, 22 P.3d at 528; see C.R.S. § 24-30-1517(2) ("Nothing in this part 15 shall apply to the university of Colorado system, including the university of Colorado at Boulder, Denver, and Colorado Springs and the university of Colorado health sciences center."); C.R.S. § 24-30-1510(d)(4) ("Moneys in the risk management fund shall not be used to pay . . . [e]xpenses for complying with successful claims for injunctive relief…").

Thus, a proper application of the appropriate analysis supports the conclusion that The Board is not an arm of the state, but rather a political subdivision subject to suit under § 1983 pursuant to *Monell* and not protected by the Eleventh Amendment.  To the extent the Court identifies any material factual disputes here, Plaintiff requests that this Court conduct a hearing regarding The Board's autonomy from the State, and allow the parties to exchange targeted discovery regarding the same, specifically to determine 1) how much of The Board's funds come from non-state sources, 2) how judgments against The Board are paid, and 3) the extent to which The Board is controlled by the State.

### d. The decisions cited by The Board are not binding or persuasive

The Board cites several decisions in support of its argument that it is entitled to Eleventh Amendment Immunity, and is not a "person" subject to suit under § 1983, yet none of the cases provide binding, precedential, or even applicable authority to support such contentions.  Initially, *Rozek v. Topolnick*, 865 F.2d 1154 (10th Cir. 1989), rested upon on a misunderstanding of state law and conflicts with controlling Supreme Court authority.  *Rozek*'s entire Eleventh Amendment analysis is this:

> Rozek himself cited evidence and law that demonstrate that the University of Colorado is entitled to claim Eleventh Amendment immunity. See Colo.Rev.Stat. § 23-20-111 (1973 and Supp. 1986); Colo.Rev.Stat. § 23-20-112 (1973 and Supp. 1986); *Uberoi v. University of Colorado*, 713 P.2d 894 (Colo. 1986). In *Uberoi*, the Colorado Supreme Court held that the University of Colorado is a "public entity" subject to suit under the Colorado Governmental Immunity Act. 713 P.2d at 898.

865 F.2d at 1158 (internal citation omitted).

As noted above, C.R.S. § 23-20-111 gives The Board "general supervision of the university and control and direction of all funds of and appropriations to the university." This does not support the conclusion that it is protected by the Eleventh Amendment; to the contrary (see *supra*).

Likewise, C.R.S. § 23-20-112 provides plenary powers to The Board, which indicates that The Board is separate from the state, and thus, not covered by the Eleventh Amendment.

In *Robinson v. Bd. of Regents of Univ. of Colo.*, 390 F. Supp.2d 1011 (D. Colo. 2005), the Court concluded, based on *Rozek*, that the University of Colorado is an arm of the state; yet *Robinson* did not provide analysis of the issue, nor did it apply the appropriate multi-factor test. Moreover, *Robinson*, similar to *Rozek*, is problematic in that state law cannot bestow Eleventh Amendment immunity on a governmental entity that is not entitled to Eleventh Amendment immunity under federal law.  Again, *Ruiz v. McDonnell*, 299 F.3d 1173 (10th Cir. 2002) is cited for a proposition that is not at issue, to wit: that there are two exceptions to the Eleventh Amendment jurisdictional bar.  In fact, the Court in *Ruiz* noted that "to assert Eleventh Amendment immunity, a defendant must qualify as a state or an "arm" of a state" and that there was "no dispute between the parties that the CDHS qualifie[d] as an 'arm' of the state of Colorado."  Of course, that issue is directly in dispute here.

Finally, the *Slover* decision cited by Defendants (*Slover v. Univ. of Colorado*, No. 1:21-CV-01378-SKC, 2022 WL 833364, at *2) did not address the issue of Eleventh Amendment Immunity as to 42 U.S.C. § 1983 claims, rests on a misapprehension of applicable law, and is inapposite.

In sum, applying the correct *Mt. Healthy-Simon* multifactor test, The Board is an "political subdivision" rather than an "arm of the state" and is thus a "person" subject to suit for purposes of 42 U.S.C. § 1983.  For the forgoing reasons, Plaintiff respectfully requests that this Honorable Court deny Defendant's motion accordingly.

## II.   Plaintiff's official capacity claims should be sustained

As to the official capacity claims, Dr. Reddy cannot assert Eleventh Amendment immunity against claims for prospective injunctive relief. See, *Johns v. Stewart*, 57 F.3d 1544 (10th Cir. 1995) (citing *Ex parte Young*, 209 U.S. 123 (1908). In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as "prospective". See, *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1214 (10th Cir. 2019) (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). The Tenth Circuit has held that "[r]einstatement of employment is a form of prospective equitable relief that is within the doctrine of *Ex parte Young*." *Meiners v. Univ. of Kansas*, 359 F.3d 1222, 1232-33 (10th Cir. 2004); see also, *Ellis v. Univ. of Kansas Med. Ctr.*, 163 F.3d 1186, 1198 (10th Cir. 1998) (holding that the plaintiff's request for reinstatement to the night shift was prospective relief allowed under *Ex parte Young*). Though Plaintiff complains of injuries that occurred in the past, she requests relief that includes prospective relief. See *Garcia v. Metropolitan State Univ. of Denver*, No. 19-CV-02261-RBJ, 2020 WL 886219, at *9 (D. Colo. Feb. 24, 2020) ("Ms. Garcia's requested injunctions prohibiting enforcement of sanctions and immediate reinstatement contemplate prospective relief as well."). As long as Plaintiff's complaint alleges specific facts showing that Drs. Thor and Anderson have sufficient connection with the act or conduct, he may seek to enjoin Drs. Thor and Anderson under *Ex Parte Young*.

Here, Plaintiff has expressly requested injunctive relief, that Defendants', including Dr. Reddy, be enjoined from taking any further discriminatory actions against Plaintiff. Therefore, the official-capacity claims against Dr. Reddy are sustainable, irrespective of any Eleventh Amendment immunity argument.

## AS TO DEFENDANTS' POINT VI: DISPUTED

I.   **Plaintiff has Pled a Violation of her Clearly-Established Right to Due Process**

The circumstances surrounding Plaintiff's decade of employment with CU including her constructive termination, support Plaintiff's Due Process deprivation claim.   At the outset, Defendants do not appear to directly contest the fact that Plaintiff was constructively discharged, other than making reference to the fact that she allegedly admitted to "resigning".   See, Defendants' MTD at 5, 7.   However, Plaintiff's complaint makes clear that work environment became so severe that she was forced to resign, tantamount to constructive termination.   See, ECF No.: 1 at ¶137.   Regardless, it is well-established that whether a constructive discharge occurred is a question of fact to be resolved by the jury.   See, *Strickland v. UPS*, 555 F.3d 1224, 1228 (10th Cir. 2009).

Moreover, the Tenth Circuit has repeatedly held that a constructive discharge from employment is actionable under § 1983 if an employee possesses a constitutionally-protectable property or liberty interest in her employment.   See, e.g. *Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir. 1992); *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1221 (10th Cir. 2000); *Yearous v. Niobrara Cnty. Mem'l Hosp.*, 128 F.3d 1351 (10th Cir. 1997); *Bailey v. Kirk*, 777 F.2d 567, 579 (10th Cir.1985).   A constitutionally-protected protected property interest arises when a person has more than an abstract need or desire for the property or unilateral expectation of it; rather, the person must have a legitimate claim of entitlement to it.   See, *Ewy v. Strutevant*, 962 P.2d 991, 994 (Colo.App. 1998), quoting *Bd. of Regents v. Roth*, 408 U.S. 564 (1972).   Property interests subject to procedural due process protection are not limited by a few rigid, technical forms.   Rather, "property" denotes a broad range of interests that are secured by "existing rules or understandings." *Roth*, 408 U.S. at 577.   "A person's interest in a benefit is a 'property' interest

for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972), citing *Roth*, 408 U.S. at 577.

In *Perry*, the Supreme Court expressly held that a property interest may exist despite absence of explicit contractual tenure provisions, if such provision may be implied from the words and conduct of the employer.  As stated therein,

> A teacher, like the respondent, who has held his position for a number of years, might be able to show from the circumstances of this service -- and from other relevant facts -- that he has a legitimate claim of entitlement to job tenure. Just as this Court has found there to be a "common law of a particular industry or of a particular plant" that may supplement a collective-bargaining agreement, so there may be an unwritten "common law" in a particular university that certain employees shall have the equivalent of tenure.

*Perry*, 408 U.S. at 602 (citations omitted).

In *Kingsford v. Salt Lake City Sch. Dist.*, 247 F.3d 1123, 1132 (10th Cir. 2001), the Tenth Circuit concluded that an implied promise of continued employment can give rise to a constitutionally-protected property interest.  Such a promise may be found in 1) the conduct of the parties, 2) announced personnel policies, 3) practices of that particular trade or industry, or 4) other circumstances which show the existence of such a promise.  The *Kingsford* Court went further to acknowledge that under *Perry*, even express "at-will" disclaimers set forth by an employer could be negated by the conduct of the parties, thereby creating a disputed fact as to whether the employer and employees' mutual understandings created a property interest.  See *Kingsford*, 247 F.3d at 1132, citing *Perry*, 408 U.S. at 599-603.

Here, Plaintiff has shown that she had a reasonable expectation of 1) continued employment, free from discriminatory and retaliatory treatment, and 2) a full and fair opportunity to challenge discriminatory and retaliatory behavior so as to ensure corrective action.  The implied

promises made by The Board, through its written handbooks, policies, procedures, conduct, and long-standing practice, establish Plaintiff's expectation that she would not be terminated without cause. In fact, Defendant CU's Regent's Law 5.C.4, which is publicly available[5], clearly provides that "[t]he administration may terminate a tenured or tenure-track faculty appointment for cause." Consistent with this provision, it was, and remains, a longstanding pattern and practice of The Board that appointments like Plaintiff's would be renewed absent a showing of cause for non-renewal. See, Complaint ¶¶ 42-46. However, Plaintiff was terminated without lawful cause – she was effectively terminated as a result of Dr. Reddy's discriminatory and retaliatory animus.

## AS TO DEFENDANTS' POINT VII: DISPUTED

### I.  Plaintiff has Pled a Violation of her Clearly-Established Right to Equal Protection

Plaintiff has also stated a claim for violation of her clearly-established right to equal protection of the law under the Fourteenth Amendment. Defendants are mistaken that Plaintiff must plead a difference in treatment using a comparator to establish an equal protection violation. That argument would support the conclusion that it would be lawful for Defendants to expressly state they are terminating Plaintiff because she is a female, if they do not also terminate a similarly-situated male faculty member. But intentional discrimination is the hallmark of conduct prohibited by the Equal Protection Clause. See, *Washington v. Davis*, 426 U.S. 229, 240 (1976); *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987); *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271–73 (1979); *Snowden v. Hughes*, 321 U.S. 1, 8 (1944).

While showing disparate treatment of similarly situated individuals is necessary for certain claims (like class-of-one claims and claims where the plaintiff is not a protected-class member)

---

[5] See, https://www.cu.edu/regents/article-5

the Tenth Circuit, relying on Supreme Court precedent, has easily held that such a showing is not necessary for class-based equal protection claims like the claim Plaintiff has brought here.  See, *Perry v. Woodward*, 199 F.3d 1126 (10th Cir. 1999) citing *O'Connor v. Consolidated Coin Caterers Corp*. 517 U.S. 308, 311–12 (1996); see also *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220 (10th Cir. 2000) (holding that "the district court erred in requiring plaintiff to show that defendant treated similarly-situated nonminority employees differently"); *Sorbo v. United Parcel Serv.*, 432 F.3d at 1173 (10th Cir. 2005).  Under this precedent, to establish a prima facie case of discrimination Plaintiff need only show that: (1) she belonged to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge. See *Perry*, 199 F.3d at 1138.

The Complaint alleges ample facts to support a prima facie case of Dr. Reddy' intentional discrimination.  The Complaint clearly alleges that 1) Plaintiff belongs to a protected class, to wit: female (see, Complaint at ¶ 18) 2) she is qualified for her job (Id. at ¶¶ 19-22), 3) she was terminated (Id. at ¶¶83-84, 137), 4) her job will not be eliminated, and 5) Dr. Reddy humiliated, bullied, harassed, and intimated other former female CU employees, similar to the conduct undertaken towards Plaintiff (Id. at ¶¶ 72-74, 122).

Based on the foregoing, Plaintiff has sufficiently pled a violation of the Equal Protection Clause, and Defendants motion should be denied accordingly.

## AS TO DEFENDANTS POINTS VIII: DISPUTED

### I.   Plaintiff has Pled Retaliation in Violaion of the First Amendment

Defendants further contend that Plaintiff may have mistakenly pled a First Amendment Retaliation claim and that it has pled no facts supporting any of its elements.  At the outset, Defendants are correct that reference to a "Karey Krohnfeldt" in the Complaint was inadvertent.

However, the nature of applicability of the claim itself was certainly intentional and substantiated. Plaintiff has pled that after making a constitutionally-protected report to CUs human resources department, she faced increased hostility to the point that she had no choice but to resign.  Plaintiff has also pled that The Board is charged with the responsibility of the general supervision of The University of Colorado.  It is well settled that "a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." See, *Connick v. Myers,* 461 U.S. 138, 142 (1983).  The First Amendment of the United States Constitution protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern.  See, e.g., *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Connick*, *supra*, at 147; *Rankin v. McPherson*, 483 U.S. 378, 384, 107 (1987); *United States v. Treasury Employees*, 513 U.S. 454, 466 (1995).  When analyzing First Amendment retaliation claims, the Tenth Circuit has routinely applied the familiar *Garcetti-Pickering* Test.  See, *Leverington v. City of Colo. Springs*, 643 F.3d 719, 723-24 (10th Cir. 2011); *Brammer–Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007); see also, *Garcetti v. Ceballos*, 547 U.S. 410, (2006); *Pickering*, 391 U.S. 563.  This test comprises five elements: 1) whether the speech was made pursuant to an employee's official duties; 2) whether the speech was on a matter of public concern; 3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; 4) whether the protected speech was a motivating factor in the adverse employment action; and 5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.  See, *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009)[6].

---

[6] Noting that that first three prongs of the *Garcetti/Pickering* Test are legal issues to be decided by the court and the last two prongs are factual issues left to the factfinder.

Speech is made pursuant to an employee's "official duties if it is generally consistent with the type of activities the employee was paid to do." See, *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007) (quotation and alteration omitted). This inquiry requires a practical and holistic view of the relationship between the speaker's employment and the speech at issue. See, *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010). No single factor is dispositive. Id. Here, Plaintiff reported discrimination, harassment, a hostile work environment, and retaliation, (see, ECF No.: 1 at ¶¶82-84). Moreover, Defendants do not, and cannot, contend that Plaintiff's report was made as part of her official duties. Plaintiff reported as a victim, on her own behalf. Therefore, Plaintiff has satisfied the first prong of the test.

Second, "speech on a matter of public concern" is speech that can be "fairly considered as relating to any matter of political, social or other concern to the community." See, *Connick v. Myers*, 461 U.S. 138, 146 (1983). The analysis of "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record." Id. at 147-48. While speech relating to internal personnel disputes or private grievances is generally not speech on a matter of public concern, speech that addresses issues such as government waste or mismanagement, or that is "calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of government officials," does constitute speech on a matter of public concern. See, *Koch v. City of Hutchinson*, 847 F.2d 1436, 1445 (10th Cir. 1988) (en banc); *Connick,* 461 U.S. 138, 146 (1983); *Pickering*, 391 U.S. 563 (1968). Simply put, there must be a distinction between speech made "as a citizen upon matters of public concern" with speech "as an employee upon matters only of personal interest." See, *Connick,* 461 U.S. 138, 146 (1983). Here, Plaintiff's report of discrimination, harassment, hostile

work environment and retaliation at the hands of Dr. Reddy is exactly the type of internal personnel dispute that is in fact "protected speech" under the First Amendment.  In analyzing the content, form, and context of the report, as revealed by the complaint (our whole record at this juncture), the second prong of this test has been satisfied in Plaintiff's favor.

Third, with respect to balancing the governmental and employee interests (the third prong), this Court must consider "the manner, time, and place of the speech, as well as the context in which the dispute arose."  See, *Bailey v. Indep. Sch. Dist. No. 69*, 896 F.3d 1176 (10th Cir. 2018) quoting *Weaver v. Chavez*, 458 F.3d 1096, 1100 (10th Cir. 2006).  The employer bears the burden of showing that restricting the employee's speech was necessary to prevent disruption and provide efficient public service.  Id. (citing *Cragg v. City of Osawatomie*, 143 F.3d 1343, 1346 (10th Cir. 1998)).  "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech."  Id. (citing *Rankin v. McPherson*, 483 U.S. 378, 384 (1987)).  Here, Defendants have not, and cannot, meet their burden of establishing that the increased hostility and subsequent denial of lateral movement within CU was  "necessary to prevent disruption and provide efficient public service".  In fact, The Board invites those who are subjected to discrimination and retaliation to report same, so to argue that Defendants actions against Plaintiff for doing so were "necessary" would completely contradict The Board's own policy.

As a final matter, and as stated above, Defendants' constructive termination of Plaintiff was an adverse employment action against Plaintiff.  For the foregoing reasons, Plaintiff has established the plausibility of a First Amendment Retaliation claim, and Defendants' motion should be denied accordingly.

## AS TO DEFENDANTS' POINT IX: DISPUTED

**I.    Dr. Reddy's Defense of Qualified Immunity is Both
       Premature and Inapplicable**

Dr. Reddy pleas for qualified immunity at this early stage of litigation are misplaced because the Complaint pleads sufficient facts that they have each violated Plaintiff's clearly-established constitutional rights.  *Supra*, at 21-24.  See also, Complaint.  While Dr. Reddy's argument is essentially a regurgitation of there unavailing arguments addressed above, it should be further noted that the qualified immunity defense is premature and inapplicable.  Qualified immunity is not a legal defense insofar as it has no statutory or historical basis and is judicially created. See, e.g., *Ziglar v. Abassi*, 137 S.Ct. 1843, 1870-72 (2017) (Thomas, J., concurring); *William Baude, Is Qualified Immunity Unlawful*?, 106 Cal. L. Rev. 45 (2018). It has been widely reported that the Supreme Court is considering certiorari petitions in several cases that present the question of whether qualified immunity should be abandoned; and a bill has been proposed in Congress to legislatively remove qualified immunity in § 1983 cases. Accordingly, Plaintiff objects to Dr. Reddy's invocation of qualified immunity as a defense in this case to preserve their right to raise this objection, again should the law change while this case is pending.

In any event, usually, the defense of qualified immunity is not appropriate on a Fed. R. Civ. P. 12(b)(6) motion. The Supreme Court has emphasized:

> The procedural difference between the absolute and qualified immunities is important. An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity. The fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial.  See, *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13 (1976).

Generally, summary judgment provides the typical vehicle for asserting a qualified immunity defense, and raising such defense via a motion to dismiss, "subjects the defendant to a

more challenging standard of review than would apply on summary judgment." See, *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004).

Aside from the questionable viability of qualified immunity as a legal defense, and that the defense is premature, Dr. Reddy cannot establish the applicability of this defense given his intentional discriminatory behavior. As he concedes, qualified immunity does not protect those who are "plainly incompetent" or "knowingly violate the law." See, e.g. *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001) (internal quotation marks and citation omitted). If the official's conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known, then the qualified immunity defense will not stand. See, e.g. *Estrada v. Smart*, 514 F. Supp. 3d 1270 (D. Colo. 2021) citing *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (internal quotation marks omitted). In evaluating the merits of this defense, the Court must scrutinize Dr. Reddy's conduct as alleged in the complaint for "objective legal reasonableness." See, *Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); see also, *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014); *McAllister v. Kellogg*, 637 F. App'x 518, 519 (10th Cir. 2016). This Court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct. See, *Pearson v. Callahan*, 555 U.S. 223, 223–24 (2009).

As detailed above, the qualified immunity defense cannot withstand the stringent standard of a Rule 12(b)(6) motion to dismiss. The factual allegations of the Complaint, taken as true and viewed in the light most favorable to the Plaintiff, establish that Dr. Reddy has violated Plaintiff's clearly-established constitutionally-protected rights. See *McAllister v. Kellogg*, 637 F. App'x 518, 519 (10th Cir. 2016); *Seamons v. Snow*, 84 F.3d 1226, 1238 (10th Cir. 1996) (retaining jurisdiction

and reversing Rule 12(b)(6) motion to dismiss on qualified immunity because the complaint, and all inferences in favor of plaintiff, established a claim that defendants violated clearly established law); *Schwartz v. Booker*, 702 F.3d 573, 588 (10th Cir. 2012) (affirming district court order denying defendants' qualified immunity defense when due process rights were well established).

**WHEREFORE**, Plaintiff prays that this Honorable Court 1) deny Defendants' Motion to Dismiss in its entirety, 2) as to the issue regarding The Board's status as a "person" for purposes of § 1983, conduct a hearing and allow for targeted discovery prior thereto, and 3) other further relief as this Honorable Court deems just a proper.

Dated: June 29, 2022

KATZ & KERN, LLP

*Attorneys for Plaintiff*


By:      s/ Chet Kern
        Chet Kern, Esq.
        44 Cook Street
        Denver, Colorado 80206
        Tel.: (303) 398-7000
        E-mail: ckern@katzandkernllp.com

**CERTIFICATE OF SERVICE**

I certify that, on June 29, 2022, I filed the foregoing with the Clerk of the Court using

the CM/ECF system.

_s/ Chet Kern_
Chet Kern, Esq.