IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Maritza Dominguez Braswell**

Civil Action No. 22–cv–00335–MDB

WHITNEY PORTER, M.A.,

      Plaintiff,

v.

THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate, and
VENKATESHWAR "VENKAT" REDDY, in his official and individual capacities,

      Defendant.

---

## ORDER

---

      This matter is before the Court on Defendant Regents of the University of Colorado ["Board of Regents"] and Defendant Venkateshwar Reddy's [collectively "Defendants"] Motion to Dismiss. (["Motion"], Doc. No. 14.) Plaintiff Whitney Porter has responded to the Motion (["Response"], Doc. No. 36), to which Defendants have replied. (["Reply"], Doc. No. 37.) After considering the Motion, the related briefing, and the relevant law, the Court **GRANTS IN PART AND DENIES IN PART** the Motion to Dismiss.

## STATEMENT OF THE CASE

      Plaintiff, a woman, has been employed in various roles by the University of Colorado ["CU"] since earning a master's degree in 2007. (Doc. No. 1 ¶¶ 18–19.) Plaintiff has spent the entirety of her employment at CU's Colorado Springs campus ["UCCS"]. (*See generally* Doc. No. 1.) Throughout her employment, Defendant Reddy, a male, has served as Plaintiff's

superior—first as the Dean of the UCCS College of Business and later as the Chancellor of UCCS. (*Id.* ¶¶ 10–11.) On February 4, 2022, Plaintiff initiated this action, alleging that under Title VII of the Civil Rights Act, Defendant Reddy, and through its agent, the Board of Regents, discriminated against her and fostered a hostile work environment on the basis of her gender, and further retaliated against her for engaging in protected activity. (*Id.* at 19–21.) Plaintiff also asserts constitutional due process, equal protection, and First Amendment claims via 42 U.S.C. § 1983. (*Id.* at 21–22.)

## I.    Plaintiff's Employment at UCCS College of Business

In 2007, Plaintiff was hired as an academic advisor at the UCCS College of Business. (*Id.* ¶ 20.) In 2011, Plaintiff was promoted to senior academic advisor. (*Id.* ¶ 21.) Then, in December 2014, Plaintiff was appointed as the Assistant Director of Graduate Programs in the UCCS College of Business for the Graduate School of Business Administration. (*Id.* ¶ 22.) Plaintiff was in this role until she transferred to a position in the UCCS College of Education in June 2017. (*Id.* ¶ 23.) Plaintiff alleges that she was "forced out" of her Assistant Director of Graduate Programs position ["Assistant Director"]. (*Id.*)

Plaintiff alleges that during her time as an Assistant Director, she was subjected to "repeated acts of discrimination and harassment," a "pattern of traumatizing and humiliating mistreatment," and "a sexist and toxic work environment." (*Id.* at 7, ¶¶ 32, 33.) Plaintiff alleges that Defendant Reddy, then the College's dean, fueled this treatment, by having a "palpable" and "apparent" "discriminatory animus" towards her. (*Id.* ¶4.)

Plaintiff describes various alleged practices of Defendant Reddy to support her assertions. First, Plaintiff alleges that at "the direction of then-Dean Defendant Reddy, the Dean's office

monitored Plaintiff's arrival and departure times on a daily basis." (*Id.* ¶ 35.) Plaintiff alleges that

a student employee in the office "routinely received calls from the Dean's surrogates at the

conclusion of Plaintiff's workdays, inquiring as to her whereabouts." (*Id.* ¶ 37.) Further, Plaintiff

alleges that Defendant Reddy "would send his subordinates to her office at around 8:00 a.m. and

5:00 p.m. … on the pretext of inquiring about extraneous items, which could easily have been

asked about via-email….to intimidate or harass Plaintiff." (*Id.* ¶ 38.) Plaintiff says she was the

only one whose hours were regularly monitored. (*Id.* ¶ 36.)

Plaintiff also alleges that Defendants made it difficult for her to take days off due to

illness. Plaintiff was allegedly required to get a doctor's note for any sick day, even though CU

policy only requires a note for sick leaves longer than three days. (*Id.* ¶ 42.) Plaintiff suffers from

migraine headaches and was allegedly required to obtain a doctor's note for any day missed due

to a migraine. (*Id.* ¶ 40.) Plaintiff alleges she was the only person "asked to provide a medical

note in order to take a [single] sick day." (*Id.* ¶ 44.) Additionally, Plaintiff describes an alleged

incident in which, even though she was "violently ill and obtained a doctor's note," she was

"mandated [to] .. come to the office, and advised that if she did not come to work she would be

terminated." (*Id.* ¶ 45.) Plaintiff alleges that "Defendants claimed that Plaintiff had no remaining

sick days, a statement that was simpl[y] false and conjured to justify their harassing

behavior….With no reasonable alternative … Plaintiff obliged, obtained a doctor's note, and

presented to work." (*Id.* ¶¶ 46, 49.)

Plaintiff identifies other examples of a hostile office environment. First, Plaintiff alleges

that when the air conditioning system broke in her building, causing the temperature to be over

90 degrees in her office, all affected employees, except herself, were allowed to leave the office

and work from home. (*Id.* ¶¶ 51–52; *see id.* ¶¶ 53–54 ("Plaintiff was told that she had to remain in the building because she lacked an adequate set up with which to telecommute for the remainder of the day …. Contrary to Defendants' baseless assertion, Plaintiff was completely capable of working from home.").) Second, Plaintiff contends that in February 2016, she was "was forced to remain in her office and told that she could not leave it until she complete[ly] filed documents in accordance with an archaic, outdated paper system, despite the fact that UCCS moved to a digitalized system." (*Id.* ¶ 57.) Plaintiff contends that this demand was made by Wendy Adoretti, Defendant Reddy's subordinate. (*Id.* ¶ 58; *see id.* ¶ 60 ("Ms. Adoretti punitively forced Plaintiff to spend hours on this task for no reason whatsoever in order to undermine and abase Plaintiff, who was made to feel like a prisoner, which was the precise intent of the order.").) Third, Plaintiff alleges that "although others were permitted to leave work early by shifting their hours earlier in the day, Plaintiff's ability to do so was at the whim of her supervisors." (*Id.* ¶ 61.) "Regularly, Plaintiff would be assigned new work at 4:00 p.m. and told that if she were committed to the job, she should be willing to work extra hours." (*Id.* ¶ 62; *see id.* ¶ 64 ("These "11th Hour" assignments were not emergent, were designed to demoralize Plaintiff, and were punitive in nature.").)

Plaintiff further alleges that Defendants undermined her: "Routine decision-making as to student issues within the purview of Plaintiff's job were questioned and dismissed on the ground that she lacked authority, experience or the wherewithal or autonomy to perform basic tasks." (*Id.* ¶ 75.) She alleges that "the then-undergraduate director, Rashell McCann, would tell students that Plaintiff was 'misadvising' them … to undermine the students' trust in Plaintiff and cause rumors to that effect to disseminate." (*Id.* ¶ 65.) Plaintiff also alleges that she was falsely

accused of being an alcoholic and drinking inappropriately during a work event, saying the accusation was "baseless and defamatory" and made to degrade and humiliate Plaintiff. (*Id.* ¶¶ 76, 78.)

Plaintiff contends she was not alone in feeling subject to a hostile environment while working for the College of Business. She alleges "three others, including the [department's] director, quit their jobs because they could not endure the hostile work environment or were discharged."[1] (*Id.* ¶ 68.) Plaintiff also alleges that the female director hired as a replacement "expressed to Plaintiff that there was a targeted goal of discharging Plaintiff," and further, this new director "expressed that she too was subject to a toxic work environment" and "left her job because she had been micromanaged and degraded by Defendant Reddy and his subordinates." (*Id.* ¶¶ 72–75.)

Plaintiff alleges that she engaged the human resources department "on numerous occasions" while working for the College of Business. (*Id.* ¶ 81.) However, Plaintiff alleges that when she "attempted to file grievances with the human resources department, no corrective action was taken" and further, the human resources department "advised [her] that she should leave her position at the College of Business and begin working for a different college within CU." (*Id.* ¶ 82.) Plaintiff also alleges that her grievances "caused superiors to escalate their aggression toward her." (*Id.* ¶¶ 81, 82.)

Plaintiff alleges that "prior to 2016, Plaintiff had never received an unsatisfactory annual work evaluation," but she received a "below expectations" rating for the first time after the 2016

---

[1] Plaintiff alleges that after the departure of these co-workers, "the remaining student employee and Plaintiff were forced to do the work of five and the majority of the responsibility fell on Plaintiff's shoulders." (Doc. No. ¶ 69.) Plaintiff alleges that her pay was not raised, unlike other UCCS employees who were given additional responsibilities. (*Id.* ¶ 70.)

academic year. (*Id.* ¶¶ 93, 96.) Plaintiff alleges this evaluation was part of "a campaign" to "get her to quit her job or to discharge her on pretextual grounds." (*Id.* ¶ 91.) Plaintiff was given a "performance improvement plan," and it "was made clear … if she failed to meet these performance expectations, she would be terminated at the conclusion of this probationary period." (*Id.* ¶¶ 96, 97.) Further, Plaintiff alleges that when she inquired why her performance had not met expectations, she was given confusing reasons, such as she did not "fit the business culture" or too often had worked with her office door closed. (*Id.* ¶¶ 98–99.) Additionally, Plaintiff alleges that though she had several one-on-one meetings with her supervisor during the 2016 year, "no behavioral or substantive performance issues were ever brought to her attention. In fact, in 2016, Plaintiff alleges she was nominated for the 'Advisor of the Year' award." (*Id.* ¶ 100.)

By 2017, "Plaintiff was ultimately left with no choice but to resign from the College of Business" due to what she calls a "toxic, hostile, and harassing work environment."[2] (*Id.* ¶ 84.) Upon her departure from the College of Business, Plaintiff secured a temporary position with the UCCS College of Education. (*Id.* ¶ 85.) In October 2017, Plaintiff was offered and accepted a full-time position within the College of Education. (*Id.*) Unlike her position in the College of Business, this position was not "a leadership track position." (*Id.* ¶ 86.)

Plaintiff alleges that after starting her new position, "it became clear to Plaintiff that the UCCS College of Business was reading and sending emails from Plaintiff's UCCS email account." (*Id.* ¶ 87.) She also alleges that when she asked the College of Business to stop using the account, "she was told that the email was being used to communicate with College of

---

[2] Though the Complaint is not perfectly clear on this point, the Court's understanding is that Plaintiff left her position in the College of Business following the 2016–17 academic year.

Business students and that it was Plaintiff's responsibility to work with the Office of Information Technology ["OIT"] to get a new email account." (*Id.* ¶ 88.) Plaintiff says the College of Business had access to her personal email on the account. (*Id.* ¶ 90.) Plaintiff alleges that "upon reporting this to the Dean of the College of Education and OIT, Plaintiff learned that the College of Business should never have been able to use the Plaintiff's email account …and that Plaintiff was able to keep her email account." (*Id.* ¶ 89.)

## II.    Defendant Reddy Allegedly Blocks Plaintiff from a Better Position

Later, in 2019, Plaintiff applied for and was offered the position of Graduation and Academic Services Coordinator in the Office of the Registrar. (*Id.* ¶ 103.) Because Plaintiff was to be paid more than $50,000 ($52,000), the Chancellor's approval was required to finalize the hiring. (*Id.* ¶ 105.) By this time, Defendant Reddy had become the Chancellor of UCCS. (*Id.* ¶ 106.) Although Plaintiff alleges she was informally scheduled to begin the new job in January 2020, Defendant Reddy refused to sign off on Plaintiff's hiring ["2019 Failure to Hire"]. (*Id.* ¶¶ 104, 106.) Plaintiff alleges this was "in retaliation for her earlier HR complaints made during Defendant Reddy's tenure as Dean of the School of Business." (*Id.* ¶ 107.) Plaintiff alleges that she "did not receive an explanatory letter." (*Id.* ¶ 108.) Plaintiff states she "was ultimately informed that she was not given the position because her salary would have increased from $49,500 to $52,000" but says, "many administrators at UCCS earn far in excess of this amount." (*Id.* ¶¶ 108–09.)

Further, Plaintiff contends that the position was reposted for applicants during the summer of 2020. (*Id.* ¶ 110.) Plaintiff reapplied for the job and was interviewed but was ultimately informed that "she lacked the requisite experience" for the position ["2020 Failure to

Hire"]. (*Id.* ¶¶ 110–11.) Plaintiff then "sent emails to the ethics and compliance officers to

inquire how she could not be qualified for a position that had been offered to her the preceding

year" but did not get a response. (*Id.* ¶ 112.) Plaintiff also contacted the human resources

department, who told her that other candidates were more experienced. (*Id.* ¶ 113.) Plaintiff

alleges she was not given the position and has suffered "career stagnation" due to Defendant

Reddy's retaliatory motives. (*Id.* ¶¶ 114–19.)

Based on these allegations, on February 9, 2021, Plaintiff filed a complaint with the

Equal Employment Opportunity Commission ["EEOC"]. (*Id.* ¶ 120.) On November 8, 2021, the

EEOC notified Plaintiff of her right to file a lawsuit concerning her allegations. Plaintiff now

brings five causes of action: 1) gender-based discrimination[3] and hostile work environment in

violation of Title VII of the Civil Rights Act; 2) retaliation in violation of the Title VII of the

Civil Rights Act[4]; 3) a Fourth Amendment due process violation under 28 U.S.C. § 1983; 4) a

Fourteenth Amendment equal protection violation under 42 U.S.C. § 1983; and 5) First

Amendment retaliation under 42 U.S.C. § 1983.[5] (*Id.* at 19–22.) Plaintiff's claims are brought

against Defendant Reddy in his individual and official capacity.

---

[3] The Court construes Plaintiff's discrimination claim as a claim for constructive discharge from
her College of Business position.

[4] Plaintiff's retaliation claim appears to incorporate a) retaliation in the form a hostile work
environment; b) retaliation in the form of the 2019 Failure to Hire; and c) retaliation in the form
of the 2020 Failure to Hire.

[5] As pointed out by Defendants in their Motion, the Complaint states that this claim is brought
against "Defendants Board and Krohnfeldt." (Doc. No.1 at 22.) Per Defendants, Karey
Krohnfeldt is the former director of the Office of Equity at the University of Colorado Denver
and the Anschutz Medical Campus. (Doc. No. 14 at 5 n. 1.) Ms. Krohnfeldt is not a named
defendant and is not named in the Complaint. (*See generally* Doc. No. 1.) The Court construes
this claim as solely brought against the Defendant Board of Regents.

### III.     Defendants' Motion to Dismiss

Defendants have moved to dismiss the Complaint on several grounds. (Doc. No. 14.) Regarding the Title VII claims, Defendants contend Plaintiff's hostile work environment and discrimination claims from her time at the UCCS College of Business, as well as her 2019 Failure to Hire claim, must be dismissed because they are time-barred. (*Id.* at 3–5.) Defendants further contend that Plaintiff's discrimination, hostile work environment, and retaliation claims fail to state a cause of action. (*Id.* at 6–9.) Regarding the Section 1983 claims, Defendants first contend that the applicable statute of limitations bars those claims. (*Id.* at 5–6.) Defendants further argue that even if the Section 1983 claims are not time-barred, Defendants are immune from suit on these claims on Eleventh Amendment and qualified immunity grounds, or, in the alternative, Plaintiff's Section 1983 claims must be dismissed for failure to state a cause of action. (*Id.* at 9–13.)

## LEGAL STANDARD

### I.     Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v.*

*Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a Rule 12(b)(6) motion to dismiss, means that the plaintiff pleaded facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," *i.e.,* those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id*. at 679–81. Second, the court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id*. at 681. If the allegations state a plausible claim for relief, the claim survives the motion to dismiss. *Id*. at 679.

That being said, the Court need not accept conclusory allegations without supporting factual averments. *S. Disposal, Inc., v. Tex. Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S at 678. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citation omitted).

**ANALYSIS**

I.       **Timeliness of Plaintiff's Title VII Claims**

Defendants first argue that the Title VII claims stemming from Plaintiff's employment at UCCS College of Business and the 2019 Failure to Hire must be dismissed because the allegations underlying the claims occurred more than 300 days before her EEOC complaint.

"In Colorado, for a charge of discrimination to be timely, it must be filed with the appropriate agency within 300 days of the complained-of conduct." *Christie v. Loomis Armored US, Inc.*, No. 10-CV-02011-WJM-KMT, 2013 WL 3381268, at *3 (D. Colo. July 8, 2013) (citing *Proctor v. United Parcel Serv.,* 502 F.3d 1200, 1206 (10th Cir. 2007)). "Generally, each discrete act of discrimination starts its own 300 day limitation period for filing a charge as to that act." *Id.* (citing *Haynes v. Level 3 Comm'ns, LLC*, 456 F.3d 1215, 1222 (10th Cir.2006) *abrogation on other grounds recognized by Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012)). In general, "a cause of action accrues on the date the employee is notified of an adverse employment decision by the employer." *Haynes*, 456 F.2d at 1222 (10th Cir. 2006) (internal quotation marks omitted). "[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002).

However, under what is known as the continuing violation doctrine, "in cases involving a hostile work environment, the Court can consider acts that occurred outside of the 300-day limitations window[.]" *Morgan*, 536 U.S. at 112. "[S]uch claims 'cannot be said to occur on any particular day, and instead usually involve a pattern of acts that aren't actionable on their own but give rise to legal violation only when addressed in their totality.'" *Christie*, 2013 WL 3381268, at *3 (D. Colo. July 8, 2013) (quoting *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d

1174, 1178 (10th Cir.2011) (internal quotations omitted)). Indeed, "the incidents constituting a hostile work environment are part of one unlawful employment practice, [and accordingly] the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within … 300 days of any act that is part of the hostile work environment." *Morgan*, 536 U.S. at 116 (internal quotation marks omitted). In other words, an employee asserting a hostile work environment claim may maintain allegations that are over 300 days old at the time of her EEOC complaint *so long as* the most recent hostile action took place within the 300-day limitation period. *See Morgan*, 536 U.S. at 122 ("A charge alleging a hostile work environment claim … will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."). However, the Supreme Court has made clear that the continuing violations doctrine cannot save a discrete claim for discrimination. *Morgan*, 536 U.S. at 114 (saying that "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' [Plaintiffs] can only file a charge to cover discrete acts that 'occurred' within the appropriate time period").

Here, Plaintiff filed her EEOC complaint on February 9, 2021. Accordingly, to satisfy the 300-day limitation period, the complained of conduct must have occurred after April 15, 2020. Relying on this limitation, Defendants contend that Plaintiff's hostile work environment and constructive discharge claims stemming from her 2016–17 College of Business allegations, as well as the portion of Plaintiff's retaliation claim stemming from the 2019 Failure to Hire, must be dismissed as they occurred before April 15, 2020. In response, Plaintiff argues that each claim is subject to the continuing violations doctrine and thus not time-barred because some portion of

the complained of conduct—namely the 2020 Failure to Hire—occurred in the summer of 2020 and therefore within the 300-day window.

### A. Discrete Employment Actions

First, as held by the Supreme Court in *Morgan*, the continuing violations doctrine cannot save untimely "discrete acts" of discrimination. *See Morgan*, 536 U.S. at 110–15; *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 632 (10th Cir. 2012) ("[T]he Supreme Court has rejected the continuing violation doctrine for claims against multiple discrete acts of discrimination, limiting its application to hostile work environment claims."). A failure to hire is considered a discrete act. *Morgan*, 536 U.S. at 114 (listing "termination, failure to promote, denial of transfer, [and] refusal to hire" as examples of "discrete acts"). Thus, by law, Plaintiff's 2019 Failure to Hire claim cannot be temporally pegged to a later date for the purpose of a timeliness analysis via the continuing violation doctrine, and must be dismissed. *See Salemi v. Colorado Pub. Employees' Ret. Ass'n*, 747 F. App'x 675, 689 (10th Cir. 2018) ("[O]ur post-*Morgan* case law makes clear that the continuing violation theory is not available in the context of a Title VII claim based on discrete incidents of discrimination or retaliation[.]").

Likewise, the Court agrees with Defendant that Plaintiff's constructive discharge claim also must be dismissed as untimely. Though a constructive discharge claim straddles the line between a discrete act and a hostile work environment claim—as a plaintiff's decision to leave her job is a discrete event, but one that is usually predicated on a period of hostile conduct—the Tenth Circuit has said, "when the constructive discharge is complete—i.e., when the employee resigns—the discharge is most akin to a wrongful discharge by the employer, which is a discrete and identifiable act." *Chapman v. Carmike Cinemas*, 307 Fed. Appx. 164, 174 (10th Cir.

2009); *Johnson v. Spirit Aerosystems, Inc.*, No. 20-CV-00138-GKF-CDL, 2022 WL 1174120, at *7 (N.D. Okla. Mar. 24, 2022), *appeal dismissed*, No. 22-5028, 2022 WL 13631886 (10th Cir. Aug. 12, 2022) ("When the constructive discharge is complete as here, 'constructive discharge constitutes a separate actionable 'unlawful employment practice' requiring administrative exhaustion."). Accordingly, the claim based on the 2017 constructive discharge cannot be saved by the continuing violations doctrine and must be dismissed.[6]

### B.  Hostile Work Environment

Though the Complaint is not explicit in this respect, Plaintiff appears to assert a hostile work environment claim on the basis of gender and retaliation. (*See* Doc. No. 1 ¶ 130 ("Plaintiff was subjected to a hostile work environment based upon membership in protected classes."); *id.* ¶ 137 ("As a result of Plaintiff's protected opposition to discrimination and the hostile work environment … Defendants retaliated against her by … treating Plaintiff in a condescending matter, questioning her achievements, crediting accusations made against Plaintiff that lacked basis, accusing Plaintiff of unprofessional conduct, failing to thoroughly and properly investigate or otherwise address Plaintiff's complaints about discrimination, [and] making disparaging comments about Plaintiff to others[.]").)

Defendants argue that, though the continuing violation doctrine is theoretically applicable to Plaintiff's hostile work environment claim, the day-to-day hostile work environment allegations conclude in 2017, well before the April 15, 2020 deadline established by the EEOC complaint, and therefore the claim is untimely. (Doc. No. 14 at 1–3.) Plaintiff responds that,

---

[6] The Court notes however, that these "prior acts [may serve] as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113.

though she left the College of Business in 2017, she remained subject to a hostile work environment through the retaliatory 2020 Failure to Hire, and thus the continuing violation doctrine saves the claim. (Doc. No. 36 at 4–5, 5 ("[T]his behavior continued into November of 2020.").)

For Plaintiff's hostile work environment claim to be timely, the 2020 Failure to Hire must constitute a continuation of the hostile work environment. After review, the Court agrees with Plaintiff and declines to dismiss her hostile work environment claim on this basis. First, though the Tenth Circuit has not taken a position on the issue, Courts in this District have found that discrete acts of employment discrimination *can* form part of the basis of a hostile work environment claim. Most notably, in *Equal Employment Opportunity Commission v. Jackson National Life Insurance Company*, after conducting a thorough review of cases considering the issue, the Honorable Chief Judge Phillip A. Brimmer found that "nothing in *Morgan* establishes that stand-alone acts of discrimination … may not be considered as part of a hostile work environment claim." No. 16-CV-02472-PAB-SKC, 2018 WL 4360442, at *7 (D. Colo. Sept. 13, 2018); *see id.* *6 (collecting cases). The Court is persuaded by Chief Judge Brimmer's reasoning, and views the 2020 Failure to Hire as part of Plaintiff's hostile work environment claim, *so long as* it is "adequately connected" to the other allegations supporting her hostile work environment claim. *Id.* at * 6 (quoting *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011)).

Next, and as to whether the 2020 Failure to Hire *is* adequately connected to Plaintiff's other hostile work environment allegations, "[a]lthough *Morgan* itself does not provide precise instruction on how to evaluate whether the offending acts were part of 'the same actionable hostile work environment practice,'" the Tenth Circuit has "recognized several non-exclusive

factors to guide the analysis." *Hansen v. SkyWest Airlines*, 844 F.3d 914, 923 (10th Cir. 2016) (quoting *Morgan*, 536 U.S. at 120). Those factors include: "the type of these acts, the frequency of the acts, and the perpetrator of the acts," as well as "whether the acts occurred when the employee 'was working in the same place.'" *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005) (citing *Morgan*, 536 U.S. at 120); *Hansen*, 844 F.3d at 923 (quoting *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008)). "These factors are not exhaustive: *Morgan* 'does not limit the relevant criteria, or set out factors or prongs.'" *Hansen*, 844 F.3d at 923 (quoting *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2nd Cir. 2010); *see also Tademy*, 614 F.3d at 1143 (rejecting a "strict type, frequency, and perpetrator test"). And "flexibility is useful in a context as fact-specific and sensitive as employment discrimination and as amorphous as hostile work environment." *Hansen*, 844 F.3d at 923 (quoting *McGullam*, 609 F.3d at 77).

Applying these factors to the case at hand, the Court first notes that it seems unlikely that a discrete employment action—which occurs nearly three years after an employee has departed from the office or circumstances that were allegedly hostile—could usually be "adequately connected" to, and constitute a continuation of, a hostile work environment three years earlier. However, in this case, there is a uniquely identifiable throughline: the alleged hostility from Defendant Reddy. *See Duncan*, 397 F.3d at 1309 (listing "the perpetrator" as a relevant factor in whether an action is part of the same hostile work environment practice). Plaintiff alleges that she was subject to a hostile work environment, fostered by Defendant Reddy, during her time in one college of the University. She eventually left that college to work for another. Then, nearly three years later, she applied for a different position and was informed the position was hers,

only to find that Defendant Reddy, who was now the Chancellor of the entire campus refused to sign off. The position remained unfilled for months and Plaintiff re-applied but did not make it past the interview stage. Thus, based on Plaintiff's allegations, the ultimate decisionmaker in instituting and promoting a hostile environment, and later, refusing to sign off on Plaintiff's hiring, was Defendant Reddy. Taking Plaintiff's allegations as true as the Court must on this Motion, Defendant Reddy forced Plaintiff out of the College of Business then blocked Plaintiff's opportunity to work as the Graduation and Academic Services Coordinator in the Office of the Registrar. The three-year gap between Plaintiff leaving the College of Business and the 2020 Failure to Hire does not sever the connection. Moreover, while in different colleges of the University, Plaintiff was at all times employed by CU and therefore in the "same place" for the purpose of this analysis. *See Duncan*, 397 F.3d at 1309 (taking into account "whether the acts occurred when the employee 'was working in the same place.'").

As the Tenth Circuit noted, a hostile work environment claim is "amorphous" and "fact-specific," and requires "flexibility." *Hansen*, 844 F.3d at 923. Noting this guidance and emphasizing the unique allegations before it, the Court finds the 2020 Failure to Hire is adequately connected to Plaintiff's hostile work environment claim, and therefore the hostile work environment claim is not time-barred.

## II.     Timeliness of Plaintiff's 42 U.S.C. §1983 Claims

Defendants next argue that Plaintiff's equal protection, due process, and First Amendment claims must be dismissed because they are barred by 42 U.S.C. § 1983's two-year statute of limitations.

"The forum state's statute of limitations for personal injury actions governs civil rights claims[.]" *Brown v. Unified Sch. Dist. 501*, 465 F.3d 1184, 1188 (10th Cir. 2006). In Colorado, a plaintiff must file the lawsuit within two years of the accrual of the Section 1983 claim. *Carbajal v. McCann*, 808 F. App'x 620, 633 (10th Cir. 2020). A Section 1983 claim accrues when the defendant committed the wrongdoing, and the plaintiff suffered the injury. *Colby v. Herrick*, 849 F.3d 1273, 1279 (10th Cir. 2017); *Fogle v. Pierson*, 435 F.3d 1252, 1258 (10th Cir. 2006) ("A § 1983 action accrues when facts that would support a cause of action are or should be apparent."). In other words, a plaintiff must bring her Section 1983 lawsuit within two years from the date she knew or should have known that her constitutional rights had been violated. *Jones v. Bent County Corr. Facility*, No. 19-cv-03610-WJM-MEH, 2020 WL 8834798, at *6 (D. Colo. Dec. 11, 2020).

This case was initiated on February 4, 2022. (Doc. No. 1.) Accordingly, Section 1983's two-year statute of limitations bars allegations that occurred before February 4, 2020. Defendants point out that the only allegation concerning events after February 4, 2020, is the 2020 Failure to Hire. Therefore, Defendants contend, to the extent Plaintiff's Section 1983 claims are predicated on allegations outside the 2020 Failure to Hire, they must be dismissed. (Doc. No. 14 at 5–6.)

Plaintiff argues that her constitutional claims are subject to the continuing violation doctrine also and, thus, are not time-barred. (Doc. No. 36 at 4–5); *see Herrera v. City of Espanola*, 32 F.4th 980, 994 (10th Cir. 2022) ("[T]he continuing violation doctrine, as a general principle of the federal common law, is available to a § 1983 litigant."). In the context of a Section 1983 claim, "the continuing violation doctrine is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that

his or her rights have been violated." *Sierra Club v. Okla.Gas & Elec. Co.*, 816 F.3d 666, 674 (10th Cir. 2016). The doctrine applies "when the plaintiff's claim seeks redress for injuries resulting from a series of separate acts that collectively constitute one unlawful act, as opposed to conduct that is a discrete unlawful act." *Hamer v. City of Trinidad*, 924 F.3d 1093, 1098 (10th Cir. 2019). However, acts that are "easily identifiable and individually actionable ... [but] occurred outside of the limitations period, even though related to those occurring within the period, are not actionable." *Croy v. Cobe Lab'ys, Inc.*, 345 F.3d 1199, 1202 (10th Cir. 2003) (citing Morgan, 536 U.S. at 114); *see Howell v. Cox*, 758 F. App'x 480, 485 (6th Cir. 2018) ("[I]f [a] defendant's separate acts of wrongdoing are individually actionable, the continuing-violation doctrine does not apply.").

Plaintiff's Section 1983 claims are vague. In her causes of action, Plaintiff does not define which of Defendants' actions constituted each alleged constitutional violation. (*See* Doc. No. 1 at 21–22.) Still, however, based on Plaintiff's Response and the nature of each constitutional right, the Court believes it can determine whether each claim is subject to the continuing violations doctrine.

### A. Due Process Violation

First, as to Plaintiff's due process claim, the Court notes that Plaintiff's Response focuses the claim on Plaintiff's alleged constructive discharge from the College of Business. (*See* Doc. No. 36 at 17 (stating that "a constructive discharge from employment is actionable" under a due process theory "if an employee possesses a constitutionally-protectable property or liberty interest in her employment"). Further, because a due process claim is predicated on the loss of or interference with "a protectable property or liberty interest," the claim is naturally tied to

Plaintiff's alleged constructive discharge. *Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir. 1992) ("It has been clearly established since at least 1985 that constructive discharge from employment as to which an employee has a protectable property or liberty interest may be actionable under § 1983.")

Plaintiff alleges she was constructively discharged from the College of Business in 2017. The alleged discharge is an easily identifiable and individually actionable act, and accordingly a due process claim associated with that act accrued in 2017—starting a two-year statute of limitations clock that expired in 2019. The Court sees no reason why this claim would be subject to the continuing violations doctrine. To the extent the continuing violation doctrine seeks to fulfill the equitable principle that a statute of limitations should not begin to run until a reasonable person would be aware of an action that may have violated her constitutional rights, there is no reason to apply the doctrine here because Plaintiff obviously was aware that she transferred out of the College of Business. *Sierra Club*, 816 F.3d at 674. And further, the continuing violation doctrine is generally applied when a plaintiff alleges a "series" of actions that make up one alleged constitutional violation, but here there is no series of acts at issue, only one—Plaintiff's alleged constructive discharge. *Hamer*, 924 F.3d at 1098. For these reasons, Plaintiff's Count III due process claim is dismissed as untimely.

### B.  Equal Protection Violation and First Amendment Retaliation

On the other hand, as in the hostile work environment claim, the equal protection and First Amendment claims appear to allege ongoing constitutional violations, not limited to Plaintiff's constructive discharge allegation. For example, when discussing the First Amendment retaliation claim in her Response, Plaintiff references "the increased hostility" leading to her

departure from the College of Business *and* the "subsequent denial of lateral movement within CU," (the 2020 Failure to Hire) as allegations supporting the claim. (*Id.* ¶ 20.) Further, as to her equal protection claim, Plaintiff generally alleges that, since 2016, her experience at UCCS has been colored by continuous gender hostility and retaliation for reporting gender discrimination—up to and through the 2020 Failure to Hire. Accordingly, the Court finds both claims are timely under the continuing violation doctrine because they concern a series of acts that culminated in the 2020 Failure to Hire.

### III.   The Sufficiency of Allegations in Support of Plaintiff's Hostile Work Environment, 2020 Failure to Hire, and Remaining Constitutional Claims

Plaintiff's remaining claims are her Title VII hostile work environment claim and retaliation claim, her equal protection claim, and her First Amendment retaliation claim.[7] (Doc. No. 1 ¶¶ 110–13.) Defendants contend that Plaintiff has failed to state a claim for these causes of action, and they must be dismissed. The Court will review each in turn.

### A.  Hostile Work Environment

---

[7] As noted by Defendants, Plaintiff appears to assert her Title VII claims against the Defendant Board of Regents and Defendant Reddy. However, "personal capacity suits against individual supervisors are inappropriate under Title VII." *Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir. 1996). Accordingly, Defendant Reddy is entitled to dismissal of Plaintiff's Title VII claims against him in his *individual* capacity. Additionally, because Defendant Reddy's employer—the Board of Regents—is already a named defendant, Title VII claims against him in his official capacity are "superfluous." *See Lewis v. Four B Corp.*, 211 F. App'x 663, 665 n. 2 (10th Cir. 2005) ("[S]upervisors may be named in their official capacity and/or as alter egos of the employer, but just as a means to sue the employer, and this procedural mechanism is superfluous where, as here, the employer is already subject to suit directly in its own name." (internal citations omitted)). Accordingly, and for simplicity's sake, the Court will dismiss the Title VII claims brought against Defendant Reddy in his official capacity as well.

Plaintiff alleges she was subject to a hostile work environment on the basis of her gender, and later, after making complaints to human resources, she was also subject to a hostile environment in order to retaliate against her.

Where a hostile work environment claim is based on multiple forms of animus, the Tenth Circuit has not set out a firm rule as to whether the allegations must be aggregated into one hostile work environment claim or considered as separate claims. *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1227 (10th Cir. 2022). In *Hicks v. Gates Rubber Company*, the Tenth Circuit ruled it was "permissible" for courts to aggregate multiple "types" of harassment allegations to support a single claim, but did not require courts to do so. 833 F.2d 1406 (10th Cir. 1987) To this end, since the *Hicks* decision, the Tenth Circuit has not "reversed [a decision] when a court has treated [hostile work environment] claims separately." *Ford*, 45 F.4th at 1227; *See, e.g., Chavez v. New Mexico*, 397 F.3d 826, 831–32 (10th Cir. 2005) (separating racially hostile work environment claim from sex-based harassment). Accordingly, the district court may choose to review hostile work environment allegations predicated on multiple forms of hostility as one aggregated claim or as two separate claims, depending on the circumstances of the case. Here, because Plaintiff's Complaint does not create clear distinctions between allegations predicated on gender-based hostility and allegations predicated on retaliation for protected activity, the Court finds it appropriate to aggregate Plaintiff's hostile work environment allegations into a single claim.[8]

---

[8] It is worth noting that the Tenth Circuit is one of only two Courts of Appeals to not yet "formally recognize[ ]" a hostile work environment claim based on retaliation. *Kline v. Utah Anti-Discrimination & Labor Div.*, 418 F. App'x 774, 781 n.2 (10th Cir. 2011); Peter M. Mansfield, *The Retaliatory Hostile Work Environment A Hybrid Cause of Action in Search of A Standard*, 64 FED. LAW. 46, 48 n.19 (2017). However, several district courts in this Circuit have

To survive a motion to dismiss, a plaintiff's hostile work environment allegations, taken as true, must sufficiently support that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998). Further, a plaintiff must present allegations tending to show the harassment stemmed "from the animus against a protected class to which the defendant thinks the plaintiff belongs," or, in the case of retaliation, that the harassment was committed "in retaliation for protected behavior." *Slover v. Univ. of Colorado*, No. 1:21-CV-01378-SKC, 2022 WL 833364, at *4 (D. Colo. Mar. 20, 2022) (citing *Bloomer v. United Parcel Serv., Inc.*, 94 F. App'x. 820, 825 (10th Cir. 2004)); *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). "General harassment alone is not actionable." *Gorny v. Salazar*, 413 F. App'x 103, 112 (10th Cir. 2011).

Plaintiff makes the following assertions that can be construed as supporting her hostile work environment claim:

1. Her working hours were aggressively monitored. (Doc. No. 1 ¶¶ 35–38.)

2. Her ability to use sick leave was greatly restricted. (*Id.* ¶¶ 42–49.)

---

concluded that such a claim functionally exists. *See, e.g.*, *Keller v. Crown Cork & Seal USA, Inc.*, No. 10-CV-0246-J, 2011 WL 13177281, at *9 (D. Wyo. Aug. 30, 2011), *aff'd*, 491 F. App'x 908 (10th Cir. 2012) ("Despite [the *Kline*] language, it is clear the Tenth Circuit does in fact recognize claims of retaliation based upon an environment of pervasive and severe harassment."); *Kincaid v. Unified Sch. Dist. No. 500, Kansas City, Kansas*, 572 F. Supp. 3d 1081, 1089–90 (D. Kan. 2021) ("Although the Tenth Circuit has not formally recognized a claim for retaliatory hostile work environment, the Tenth Circuit has noted that retaliatory harassment, if sufficiently severe, may constitute adverse employment action for purposes of a retaliation claim…. As a result, our court frequently has analyzed claims for retaliation and retaliatory harassment as separate and distinct claims." (internal citations and quotations omitted)). The Court agrees with this analysis and recognizes Plaintiff's claim for a retaliatory hostile work environment.

3. When the College of Business's air conditioning broke, she was not allowed to work from home while others were. (*Id.* ¶ 51–54.)

4. She was given tedious and pointless tasks to "undermine and abase" her, including being commonly assigned "11th hour" work at the end of a workday. (*Id.* ¶¶ 58–64.)

5. Her superiors and fellow employees undermined her authority, specifically by questioning her credibility when talking with students. (*Id.* ¶¶ 75, 76.)

6. She was falsely and "defamator[ily]" called an alcoholic. (*Id.* ¶¶ 76, 78.)

7. She received an unsatisfactory annual evaluation for the 2016 academic year. (*Id.* ¶ 96.)

8. College of Business leadership used Plaintiff's personal email account following her departure from the college. (*Id.* ¶¶ 87–90.)

9. She was not hired as Graduation and Academic Services Coordinator in 2019 and 2020 because Defendant Reddy refused to sign off on the hiring. (*Id.* ¶¶ 103–114.)

Although not all of Plaintiff's allegations, on their own, present clear and obvious ties to her gender or her protected activity, Plaintiff does allege that a "female director expressed to Plaintiff that there was a targeted goal of discharging Plaintiff. This female director expressed that she too was subject to a toxic work environment, because both her and Plaintiff were female." (*Id.* ¶¶ 72, 73.) And, as to retaliatory motive, Plaintiff asserts that subsequent to her human resource complaints, she was subject to increased "aggression" by her superiors, and had her "expectations, duties, requirements and responsibilities" "shift[ed]." (*Id.* ¶ 92.) Further, in the section labeled "retaliation," Plaintiff states that "the hostile work environment continued" to the end of her employment, and she realleges that she was "locked in her office and required to work

manually for tasks that could undoubtedly have been performed on a computer more easily and efficiently [and was] directed to obtain medical notes for sick days." (*Id.* ¶ 101.) Additionally, Plaintiff provides a temporal connection to her human resource complaints for the unsatisfactory performance review allegations (*see id.* ¶¶ 92–93 (alleging that the College of Business gave Plaintiff her first negative performance review "after she had lodged complaints with HR"), and there is no dispute that the failure to hire allegations refer to events occurring after Plaintiff's human resource grievances.

After reviewing the allegations as a whole, the Court finds Plaintiff's allegations are sufficient to survive the Motion. Plaintiff's allegations tend to describe behavior sufficiently "pervasive" to "alter the conditions of the victim's employment and create an abusive working environment." *Davis*, 142 F.3d at 1341. Should this case reach the summary judgment stage, Defendants will have ample opportunity to show that Plaintiff's allegations are false or otherwise unconnected to her gender or human resource department grievances. However, based on the allegations before it, the Court cannot say the hostile work environment claim warrants dismissal.

### B.  Retaliation - 2020 Failure to Hire

In the absence of direct evidence, a retaliation claim is governed by the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).[9]

---

[9] The *McDonnell Douglas* evidentiary burden framework is most appropriately applied in the context of a motion for summary judgment. However, courts also use this framework as a guide in analyzing the sufficiency of pleadings at the motion to dismiss stage. *See Mormon v. Campbell County Memorial Hospital*, 632 Fed.Appx. 927, 932–35 (10th Cir. 2015) ("As the [Supreme] Court made clear, the standards for employment discrimination set forth in *McDonnell Douglas* simply do not 'apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss.' Still, *Twombly* and *Iqbal* require that a plaintiff allege a

Under *McDonnell Douglas*, a plaintiff bears the initial burden of establishing a *prima facie* case

for retaliation, at which point the burden shifts to the employer to articulate a legitimate,

nondiscriminatory reason for the discharge, and then back to the plaintiff to show that the stated

reason is pretextual. *Stover v. Martinez*, 382 F.3d 1064, 1070–71 (10th Cir. 2004).

To establish a *prima facie* case of retaliation, a plaintiff must show: "(1) that [s]he

engaged in protected opposition to discrimination, (2) that a reasonable employee would have

found the challenged action materially adverse, and (3) that a causal connection existed between

the protected activity and the materially adverse action." *Argo v. Blue Cross Blue Shield of Kan.*,

*Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*,

548 U.S. 53 (2006)).

Here, Defendants do not dispute that Plaintiff engaged in protected activity by making

several complaints to the College of Business's human resources department. (Doc. No. 1 ¶ 81.)

Further, Defendants do not dispute that the decision not to hire Plaintiff for the Graduation and

Academic Services Coordinator position was an action a reasonable employee would have found

to be adverse. Accordingly, this Court must address whether "a causal connection existed

between the protected activity and the materially adverse action." *Argo*, 452 F.3d at 1202.

When determining whether a causal connection exists to support a retaliation claim,

Courts generally focus on the temporal proximity between the protected activity and the adverse

action. "Unless there is very close temporal proximity between the protected activity and the

---

plausible claim…. [The Court] can evaluate [a plaintiff's disability discrimination] claim's
plausibility only by considering the prima facie case of discrimination that she would need to
prove in court. In pleading a discrimination claim, she need not set forth a prima facie case for
discrimination. But she must allege facts that make such a claim at least plausible." (internal
citations omitted) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002))).

retaliatory conduct, the plaintiff must offer additional evidence to establish causation." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001). Specifically, "[w]ithout other evidence, three or more months between the protected activity and the adverse action is insufficient to establish a causal connection. *Kenfield v. Colorado Dep't of Pub. Health & Env't*, 557 F. App'x 728, 733 (10th Cir. 2014) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997)). Accordingly, because the alleged 2020 Failure to Hire came years after Plaintiff engaged the College of Business human resources department, Plaintiff must provide additional support connecting the adverse action to the protected activity. After review, the Court finds Plaintiff has done so.

When a plaintiff cannot establish temporal proximity between a protected activity and the retaliatory action, the plaintiff may rely on other circumstantial evidence suggesting a retaliatory motive. For example, in *Muñoz v. Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R.*, the First Circuit upheld a jury's finding of employment retaliation when temporal proximity between his protected activity and the adverse employment action did not exist, but plaintiff demonstrated a "mosaic" of retaliatory conduct leading up to his ultimate termination. 671 F.3d 49 (1st Cir. 2012). Specifically, in *Muñoz*, the evidence demonstrated that the plaintiff was subjected to threatening comments by a supervisor who knew the plaintiff was considering engaging in protected activity, "an onslaught of letters" from the plaintiff's employer that interfered with the plaintiff's work followed the protected activity, and there was evidence of more favorable treatment for similarly situated persons who had not engaged in protected activity. *Muñoz*, 671 F.3d at 54–57. The Court found that "[w]hen all of these pieces are viewed

together and in [the Plaintiff's] favor, they form a mosaic that is enough to support the jury's finding of retaliation." *Muñoz*, 671 F.3d at 56.

Although in a procedurally different posture, this case is like *Muñoz*, in that Plaintiff has alleged sufficient circumstantial evidence that tends to demonstrate a retaliatory motive. First, as discussed above, the allegations, taken as true, support a retaliatory hostile work environment claim stemming from Plaintiff's time as a College of Business employee. (*See supra* at 20–22.) Based on this finding, the 2020 Failure to Hire is contextualized as the logical continuation of an ongoing retaliation campaign against Plaintiff. Further, Plaintiff specifically alleges that Defendant Reddy *personally* blocked her initial attempt to be hired as the Graduation and Academic Services Coordinator in 2019. (Doc. No. 1 ¶ 107). A claim stemming from the 2019 Failure to Hire is time-barred (*see supra* at 13-14), but the allegations nevertheless contextualize the alleged 2020 Failure to Hire, and help Plaintiff overcome the lack of temporal proximity between her human resource grievances, and the 2020 Failure to Hire. *See Dunn v. Shinseki*, 71 F. Supp. 3d 1188, 1193 (D. Colo. 2014) ("A plaintiff can also demonstrate causation by showing, through additional evidence, a pattern of retaliatory conduct beginning soon after the protected activity." (citing *Meiners v. Univ. of Kansas*, 359 F.3d 1222, 1231 (10th Cir.2004); *see also Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996) (stating that a lack of temporal proximity can be overcome "where the pattern of retaliatory conduct begins soon after the [protected activity] and only culminates later in actual discharge").

For these reasons, the Court finds Plaintiff's allegations concerning the 2020 Failure Hire, are sufficient to overcome the Motion, and the Court declines to dismiss this retaliation claim.

### C.  Equal Protection Violation

In the Motion, Defendants contend that Plaintiff's equal protection claim must be dismissed because "Plaintiff has not alleged that she was treated differently than other similarly-situated employees based on her gender." (Doc. No. 14 at 11.) In her Response, Plaintiff does not appear to dispute the contention that her allegations fail to identify similarly-situated male employees who were treated differently but argues, "Defendants are mistaken that Plaintiff must plead a difference in treatment using a comparator to establish an equal protection violation." (Doc. No. 36 at 18.)

"Different types of equal protection claims call for different forms of review." *Brown v. Montoya*, 662 F.3d 1152, 1172 (10th Cir. 2011). "But in each instance, 'to assert a viable equal protection claim, plaintiffs *must* first make a threshold showing that they were treated differently from others who were similarly situated to them.'" *Id.* at 1172–73 (emphasis added) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir.1998)); *see Bartell v. Aurora Pub. Schools*, 263 F.3d 1143, 1149 (10th Cir.2001) ("[W]ith any equal protection claim, [the plaintiff] must also demonstrate that he was treated differently than another who is similarly situated." (quotation omitted)), *overruled on other grounds by Pignanelli v. Pueblo School Dist. No. 60*, 540 F.3d 1213 (10th Cir. 2008).

As Plaintiff appears to admit in her Response, the Complaint does not allege Plaintiff was treated differently than similarly-situated male employees. (*See generally* Doc. No. 1.) Plaintiff cites several cases which she says stand for the proposition that a comparator "showing is not necessary for class-based equal protection claims." (Doc. No. 36 at 19 (citing *Perry v. Woodward*, 199 F.3d 1126 (10th Cir. 1999); *Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d

1220 (10th Cir. 2000); *Sorbo v. United Parcel Serv.*, 432 F.3d at 1169 (10th Cir. 2005).)

However, those cases do not involve equal protection claims and thus cannot controvert the

Tenth Circuit's clear instruction in *Brown*. 662 F.3d at 1172–73.

Accordingly, Plaintiff has not pled a cognizable equal protection claim, and the claim

must be dismissed. However, the Court will dismiss this claim without prejudice. Should

Plaintiff find herself in a position to bring plausible allegations that similarly-situated male

UCCS employees have been treated differently, she may file a motion to amend her Complaint,

attaching a proposed amended complaint adding such allegations.

### D.  First Amendment Retaliation

Finally, Defendants contend that Plaintiff's First Amendment retaliation claim must be

dismissed because "it consists entirely of legal conclusions with no factual support." (Doc. No.

14 at 11.)

First Amendment retaliation claims are analyzed under the *Garcetti-Pickering* test. *See*

*Leverington v. City of Colo. Springs*, 643 F.3d 719, 723-24 (10th Cir. 2011); *see also Garcetti v.*

*Ceballos*, 547 U.S. 410 (2006); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). The test has five

inquiries:

> (1) whether the speech was made pursuant to an employee's official duties; (2)
> whether the speech was on a matter of public concern; (3) whether the
> government's interests, as employer, in promoting the efficiency of the public
> service are sufficient to outweigh the plaintiff's free speech interests; (4) whether
> the protected speech was a motivating factor in the adverse employment action;
> and (5) whether the defendant would have reached the same employment decision
> in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir.2009). A plaintiff must establish each

element to succeed on a First Amendment retaliation claim.

Here, Plaintiff's internal discussions with human resources are not a "matter of public concern," and thus Plaintiff has failed to state a First Amendment retaliation claim. "Speech is a matter of public concern if it is 'of interest to the community.'" *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014) (quoting *Brammer–Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007). In analyzing this, courts "focus on the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest." *Id.* (quoting *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000)).

> "When an employee speaks as an employee upon matters only of personal interest the speech is not protected. To judge whether particular speech relates merely to internal workplace issues, courts must conduct a case by case inquiry, looking to the *content, form, and context* of the speech which includes scrutinizing whether the speaker's purpose was to bring an issue to the public's attention or to air a personal grievance."

*Moore v. City of Wynnewood*, 57 F.3d 924, 932 (10th Cir. 1995) (internal quotations and citations omitted) (emphasis added).

In the context of sexual harassment, the Eleventh Circuit has said, "where an employee's concerns about sexual harassment focused on the conditions of her own employment and were not spoken in public, but instead, were made in the form of a complaint to an official body, the speech was not a matter of public concern." *Thampi v. Manatee Cnty. Bd. of Comm'rs*, 384 F. App'x 983, 989 (11th Cir. 2010) (citing *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir.1993)) Similarly, in *Quinones v. City of Binghamton*, the Second Circuit found that a police lieutenant's meeting with the city's personnel director and corporation counsel, in which he reported that the city's Chief of Police had called the Assistant Chief a racist, was not a matter of public concern. 997 F.3d 461, 464–65, 466–67 (2nd Cir. 2021); *see also Callaway v. Hafeman,* 832 F.2d 414,

417 (7th Cir. 1987) (employee's private complaints of sexual harassment were not matter of

public concern); *Moore v. Gates*, No. SACV190009DOCADSX, 2019 WL 4316512, at *4 (C.D.

Cal. May 13, 2019) ("[When the plaintiff] spoke to Human Resources about

alleged discrimination that was happening to *him* in the workplace, [he] was therefore speaking

on a matter of personal concern, not one of public concern") (emphasis in original) (internal

citation omitted)).

In *Hom v. Squire*, the Tenth Circuit affirmed the defendants' summary judgment award

on a First Amendment retaliation claim that was based in part on the allegation the plaintiff was

terminated due to his internal complaint that his supervisors used an "illegal bidding processes."

81 F.3d 969, 972 (10th Cir. 1996). The court found that, though the plaintiff alleged illegal

activity, his complaints were not matters of public concern because his "grievances involved

only matters of internal departmental affairs and personal interest, and thus his expression in

support of his grievance was not protected by the First Amendment." *Id.* at 974; *see also*

*Quinones*, 997 F.3d at 467 (stating that complaints "motivated by concerns about [one's] career"

and without evidence of any "broader public purpose" are not speech of public concern).

So too, here. Plaintiff's discussions with human resources about  any alleged

discrimination is a grievance that involves only matters of internal affairs and personal interest;

they are not a matter of public concern and therefore the expression in support of Plaintiff's

grievance is not protected by the First Amendment.[10]

---

[10] Additionally, the Court also notes that Plaintiff has alleged very little about the *content* of her
human resources complaints. Indeed, though it appears implied, the Complaint never even
explicitly asserts that the complaints made allegations of gender discrimination, let alone discuss
specific allegations that were made. (See Doc. No. 1 ¶ 81–82.) So, even if the Court found that
the context and form of Plaintiff's grievances could support the conclusion that the grievances

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that Defendants' Motion to Dismiss (Doc. No. 14) is **GRANTED IN PART AND DENIED IN PART** as follows:

1. The Motion to Dismiss is **GRANTED** as to all Title VII claims brought against Defendant Reddy in his individual and official capacity.

2. The Motion to Dismiss is **GRANTED** as to the Title VII claims brought Defendant Board of Regents in Counts I and II, to the extent those claims are based on:

    a. Plaintiff's alleged constructive discharge, and

    b. the 2019 Failure to Hire.

3. The Motion to Dismiss is **GRANTED** as to Plaintiff's 42 U.S.C. § 1983 claims against all Defendants in Counts III, IV, and V, as follows:

    a. Plaintiff's Count III due process claim is dismissed *with prejudice* as time-barred.

    b. Plaintiff's Count IV equal protection claim is dismissed *without prejudice*. Should Plaintiff find herself in a position to bring plausible allegations that similarly-situated male UCCS employees have been treated differently she may file a motion to amend her Compliant on or before April 17, 2023.

    c. Plaintiff's Count V First Amendment retaliation claim is dismissed *with prejudice*.

4. The Motion to Dismiss is **DENIED** as to the Title VII claims brought against the Defendant Board of Regents in Counts I and II, to the extent those claims are based on:

    a. A gender-based and retaliatory hostile work environment, and

---

were a matter of public concern, the Court still may be required to dismiss the claim pursuant to Rule 12(b)(6).

   b.  Plaintiff's 2020 Failure to Hire retaliation claim.

Dated this 28th day of March, 2023.

**BY THE COURT:**

_____

Maritza Dominguez Braswell
United States Magistrate Judge